UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| MARSH SUPERMARKETS, INC., | ) | |
|        Plaintiff/Counterclaim | ) | |
|        Defendant | ) | |
| | ) | 1:09-cv-00458-SEB-TAB |
|     vs. | ) | |
| | ) | |
| DON E. MARSH, | ) | |
|        Defendant/Counterclaim | ) | |
|        Plaintiff. | ) | |
| _____ | ) | |
| | ) | |
| DON E. MARSH, | ) | |
|        Third Party Plaintiff | ) | |
| | ) | |
|     vs. | ) | |
| | ) | |
| EMPLOYMENT AGREEMENT BY AND | ) | |
| BETWEEN DON E. MARSH AND | ) | |
| MARSH SUPERMARKETS, INC., | ) | |
|        Third Party Defendant. | ) | |

**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This matter comes before the Court on the Motion for Summary Judgment [Docket

No. 95], filed on April 18, 2011 by Defendant, Don E. Marsh ("Mr. Marsh").[1]  Marsh

Supermarkets, Inc. has brought this lawsuit against Mr. Marsh, its former Chairman and

Chief Executive Officer (CEO), asserting breach of contract, fraud, and a claim under

ERISA § 502(a)(3)(B)(ii).  Mr. Marsh now moves for summary judgment on all counts of

Plaintiff's First Amended Complaint.  Further, he seeks summary judgment with respect

_____

[1]In the Motion, Defendant's counsel refers to its client as Don "[t]o avoid confusion with
the eponymous corporate entity."  Throughout this entry, we will refer to him as "Mr. Marsh."

to three counts contained in his Amended Counterclaim: Count I, which asserts

violations of ERISA, 29 U.S.C. § 1132(a)(1); Count Two, which asserts breach of

contract by Marsh Supermarkets; and Count VI, which requests a declaratory judgment

pursuant to 28 U.S.C. § 2201. Having considered the parties' briefing and documentary

evidence filed in connection with this motion, the Court now DENIES Defendant's

Motion for Summary Judgment.[2]

### Factual Background[3]

Marsh Supermarkets ("the Company") is an Indiana corporation with its principal

place of business in Indianapolis, Indiana. First Am. Compl. ¶ 5. The Company does

business as a regional grocery chain headquartered in Indianapolis; it also has satellite

locations throughout Indiana and Ohio. *Id.* ¶ 2 & n.1. Mr. Marsh is a resident of

Hamilton County, Indiana and was formerly the Chairman and CEO of the Company. *Id.*

¶¶ 1, 6. He assumed these roles with the Company in 1968 and continued to serve in such

capacity until September of 2006. *Id.* ¶ 7; Def.'s Br. at 3.

This lawsuit reflects the Company's efforts to recoup the allegedly substantial

financial losses caused by Mr. Marsh during his term as CEO of the Company. Mr.

---

[2]Also before the Court is Plaintiff's Motion for Partial Summary Judgment [Docket No. 98], in which Plaintiff argues that Count III of Defendant's Amended Counterclaim is preempted by ERISA § 514, 29 U.S.C. § 1144. Given Defendant's voluntary dismissal of Count III of his Amended Counterclaim in his Response [Docket No. 107], Plaintiff's motion is denied as moot.

[3]We have summarized the facts underlying this litigation in our prior ruling on the partial summary judgment motion, so we need not undertake the usual elaborate and detailed recitation of those facts.

Marsh is accused of an ongoing pattern consisting of literally hundreds of instances extending over several years whereby he essentially treated the Company's coffers as his personal wallet to finance a lavish lifestyle. The Company contends that Mr. Marsh was able to perpetrate these excesses and secure reimbursement for them by relying on an "e-voucher" system[4] that permitted him to self-classify his expenses and obtain reimbursement without any review or necessary approval by other corporate officers or the Board of Directors (the "Board"). Through this system, the Company alleges that Mr. Marsh defrauded it out of millions of dollars and placed it at risk with the Internal Revenue Service (IRS) for improper deductions, which the Company later repaid with penalties. For purposes of the summary judgment motion filed by Mr. Marsh, the factual details constituting his "bad acts" are not disputed.

## 1. The Employment Agreement

In August 1999, the Company's Compensation Committee entered into new employment contracts with Mr. Marsh and other senior executives. Def.'s Br. at 6. The employment agreement between Mr. Marsh and the Company (the "Agreement") had a term of five years, with automatic yearly extensions unless either party gave written notice to the other of termination. In any event, the term of the Agreement was to end on the date of Mr. Marsh's voluntary retirement from the Company. Agrmt. at 2. The law

---

[4]The e-voucher system involved processing each invoice or voucher submitted by an executive through the accounting department according to its assigned number. A specific employee processed all e-vouchers and the supporting documents for each e-voucher request to preserve confidentiality. Def.'s Br. at 4-5.

firm of Faegre Baker Daniels LLP, counsel for the Company, prepared the Agreement, and the Compensation Committee "relied on [counsel] . . . to guide it on the [A]greement." Def.'s Br. at 6-7.

The Agreement required Don Marsh to act as Chairman of the Board, President, and CEO of the Company. In performing the duties associated with these positions, which were explicitly deemed "personal to the Executive," Mr. Marsh was subject to the direction of the Board. Thus, he was to report regularly to the Board and any of its executive committees. Agrmt. at 2-3, 11. He further "agree[d] to devote substantially his full time, attention and energies to the Company's business," although he was permitted to participate in charitable activities "as long as such activities [did] not materially interfere with his work for the Company." *Id.* at 3.

Article 5 of the Agreement set out the terms of Mr. Marsh's compensation and related employment benefits. *Id.* at 3-5. In particular, Section 5.7 detailed the perquisites the Company agreed to provide him, which included a car. *Id.* at 4. Further, Section 5.8 reserved the Company's right to change or discontinue any "bonus, incentive, or benefit plan or perquisite" as long as it was considered standard practice and did not "adversely affect any vested right of the Executive thereunder." *Id.* at 5. Article 6 contained the Company's promise to reimburse Mr. Marsh "for all ordinary and necessary business expenses, in a reasonable amount, which the Executive incur[red] in performing his duties under this Agreement," in accordance with then-existing policies. *Id.*

Article 7 of the Agreement covered terminations of employment by death and/or

disability, as well as "for cause" terminations by the Board based on any grounds

specified in Section 8.1, to wit:

> (a) the willful and continued failure of the Executive to perform substantially the Executive's duties owed to the Company after a written demand for substantial performance is delivered to the Executive which specifically identifies the nature of such non-performance; (b) the willful engaging by the Executive in gross misconduct significantly and demonstrably injurious to the Company; or ©) conduct by the Executive in the course of his or her employment which is a felony or fraud that results in material harm to the Company.

Agrmt. at 8. The Company could also terminate Mr. Marsh's employment "without

cause," and Mr. Marsh had the reciprocal power to terminate the Agreement "for good

reason." *Id.* at 6-7. Additionally, Mr. Marsh had the right to terminate the Agreement

upon his retirement. *Id.* at 7.

The terms of any ensuing financial payout by the Company to Mr. Marsh based on

each type of potential termination of his employment were also detailed in the

Agreement. One term to which the parties have attached particular significance is Section

8.7 of the Agreement, which defined the Salary Continuation Benefit in relation to Mr.

Marsh's base salary and annual bonuses during the ten years prior to the termination date.

Agrmt. at 10. Various methods of termination under the Agreement required the

Company to pay Mr. Marsh this benefit. Notably, the Salary Continuation Benefit

accompanied termination "without cause" but was unavailable in a "for cause"

termination. *Id.* at 6.

Several other provisions in the Agreement were routine inclusions and are not in

apparent dispute in this lawsuit. The section on which Mr. Marsh relies in seeking

summary judgment is Section 12.7, entitled "Payment Obligation Absolute." Section

12.7, which Mr. Marsh characterizes as a "hell-or-high-water provision," provides in its

entirety as follows:

> The Company's obligation to make the payments and the arrangements and
> benefits provided for or referred to herein shall be absolute and unconditional, and
> shall not be affected by any circumstances, including, without limitation, any
> offset, counterclaim, recoupment, defense or other right which the Company may
> have against the Executive or anyone else. All amounts payable by the Company
> hereunder shall be paid without notice or demand. Each and every payment made
> hereunder by the Company shall be final, and the Company shall not seek to
> recover all or any part of such payment from the Executive or from whosoever
> may be entitled thereto, for any reasons whatsoever.

> The Executive shall not be obligated to seek other employment in mitigation of the
> amounts payable or arrangements made under any provision of this Agreement,
> and the obtaining of any such other employment shall in no event effect any
> reduction of the Company's obligations to make the payments and arrangements
> required to be made under this Agreement.

Agrmt. at 13; *see* Def.'s Br. at 1.

## 2. Financial Decline of the Company and Termination of David and Don Marsh

In May 2005, Mr. Marsh fired the Company's Chief Financial Officer and hired

John Elbin in July of that year as a replacement. Mr. Elbin investigated the Company's

financial situation and reported to the Board shortly thereafter that expenses—including

executive expenses and those involving the Company's airplane—needed to be reduced.

Elbin Dep. at 29-30; Def.'s Br. at 9. Following the Board's discovery of Mr. Marsh's

pervasive and extensive misappropriations of Company funds for his personal gain, and

of his son David's similar patterns of financial abuses utilizing the e-voucher system, the

Company was made aware that their abuses had brought it to the point where the

Company "was being self-liquidated" such that it "would crash." Elbin Dep. at 19-21; Def.'s Br. at 8. Facing possible insolvency, the Board decided to sell the Company. Elbin Dep. at 19-21; Def.'s Br. at 8-9.

When David Marsh refused a modification to his Agreement with the Company, his employment was terminated "without cause" in February of 2006. *See* Def.'s Br. Ex. 1 Tab A (Huse Dep.). David rejoined by suing the Company for severance benefits to which he claimed was entitled.[5] The Company classified this action as "termination without cause" but advised David by letter as follows:

> [A] former officer . . . has recently advised the Board that "corporate irregularities" have occurred . . . . If you have been involved in any such regularities that would constitute "Cause" . . . or if you have concealed those irregularities from the Board in violation of your fiduciary duties, such concealment would have effectively prevented the Board from proceeding with termination procedures under Section 7.3 of the Agreement. If the Company's investigation reveals that to be the case, the Board will treat your termination as a termination for Cause . . . .

Def.'s Br. at 14.

In September 2009, Sun Capital Partners, Inc. ("Sun Capital") acquired the Company and installed Frank Lazaran as its new CEO. Mr. Lazaran sent a letter terminating Mr. Marsh's employment "without cause" on September 28, 2006. Def.'s Br. at 16. Mr. Marsh's termination occurred as a part of the sale transaction; the pre-sale Board apparently had not made a decision about whether to retain him as CEO or to terminate him "for cause." The Board's indecision was tied in part to its desire not to

---

[5]This lawsuit, *Marsh v. Marsh Supermarkets, Inc.*, No. 1:06-cv-01395-JDT-TAB, 2007 WL 1597938 (S.D. Ind. 2007), was dismissed with prejudice on October 9, 2007.

create a negative impact on the Company's stock value prior to its sale.  *See* Def.'s Br. at 10.  It is a matter of dispute between the parties whether the full extent of Mr. Marsh's intentional misappropriations was known prior to the sale or only after the sale.[6]

After acquiring the Company, Sun Capital continued the investigation into Mr. Marsh's misdeeds as well as those by David Marsh.  The new Board adopted a resolution that stated in part that–

> investigation has revealed that, over the course of his employment, [David] Marsh improperly caused the Corporation to pay for personal, non-business expenses totaling in the hundreds of thousands of dollars . . . [and David] Marsh did so through the use of an 'e-voucher system' and so called 'petty cash' and . . . [David] Marsh did not reimburse the Corporation for these personal, non-business expenditures.

Def.'s Br. Ex. 96 at 1.  Accordingly, the Board reclassified its termination of David Marsh's employment as "termination for cause."  Def.'s Br. at 17.  The Board made no such reclassification with respect to Mr. Marsh.  *Id.*

In December 2006, discussions commenced between Mr. Marsh's counsel and the Company regarding Mr. Marsh's alleged misuse of the e-voucher system and the Company's petty cash account.  The publicity attached to the claims of the Company against both Mr. Marsh and David Marsh also piqued the interest of the IRS.  Following the IRS's determination that $5.274 million worth of travel and entertainment expenses

---

[6]Mr. Marsh does not indicate whether the Board considered its pre-sale finance investigation complete at this time.  By contrast, the Company suggests that the investigation remained pending, alleging that, "[h]ad the pre-sale board completed its investigation and concluded that Don had intentionally misappropriated Company funds, it would have terminated Don for cause."  Pl.'s Br. at 26.

generated during the audit period running between April 1, 2004 and September 2006 had been improperly deducted by the Company, the Company repaid this amount along with the associated penalties. Pl.'s Br. at 30; Pl.'s Br. Ex. 95 at 2-3. On March 25, 2009, after efforts failed to effect a negotiated settlement of their differences, the Company filed suit against Mr. Marsh.

**3. Plaintiff's Claims and Defendant's Counterclaims**

The claims brought by the Company in its First Amended Complaint against Mr. Marsh are as follows: Count I (breach of employment agreement, including fraudulent concealment), Count II (fraud and deceit), and Count III (ERISA). Mr. Marsh has answered these allegations by denials, affirmative defenses, and a counterclaim alleging the following: Count I (ERISA violations), Count II (breach of contract), Count III (violations of the Indiana Wage Act), Count IV (civil damages for a fraudulent tax filing), Count V (negligence), and Count VI (a declaratory judgment regarding the Company's alleged contractual obligation to pay the costs and fees of this litigation).

Mr. Marsh seeks summary judgment on the three claims in the Company's First Amended Complaint and on Counts I (ERISA), II (breach of contract), and Count VI (the declaratory judgment claim) of his Amended Counterclaim. That motion is currently before the Court.

<u>Legal Analysis</u>

**I. Standard of Review**

Summary judgment is appropriate when the record demonstrates that there is "no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Generally, construction of a written contract is a question of law for which summary judgment is particularly appropriate." *N. Ind. Pub. Serv. Co. v. Dabagia*, 721 N.E.2d 294, 299 (Ind. Ct. App. 1999) (citation omitted). Only when a contract is ambiguous or its terms are uncertain will extrinsic facts be useful in construing the contract and ascertaining the parties' intent. *See Fresh Cut, Inc. v. Fazli*, 650 N.E.2d 1126, 1133 (Ind. 1995). Otherwise, interpretation of the contract "is purely a question of law to be determined by the trial court." *Id.* (citation omitted). Hence, our task is to determine whether the Agreement is ambiguous in any of its terms material to the dispute before us. In considering this question, we must draw all reasonable inferences in the light most favorable to the non-moving party. *See Anderson*, 477 U.S. at 255. However, neither the "mere existence of some alleged factual dispute between the parties," *id.* at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

Initially, the moving party is responsible for "informing the district court of the basis for its motion and identifying those portions of [the record] which it believes

demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. *Id.* at 325.

Summary judgment is neither a substitute for a trial on the merits nor a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in favor of the non-moving party, if genuine doubts remain and a reasonable factfinder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enters., Inc. v. First Chi. Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir. 1989). But if it is clear that the moving party will be unable to satisfy the legal requirements necessary to establish his case, summary judgment is not merely appropriate, but mandated. *See Celotex*, 477 U.S. at 322; *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003). Moreover, a party's failure to prove one essential element "necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

A plaintiff's statements which are self-serving, speculative, or not founded upon personal knowledge, and which are unsupported by specific concrete facts reflected in the record, cannot preclude summary judgment. *Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999); *Slowiak v. Land O'Lakes, Inc.*, 987 F.2d 1293, 1295 (7th Cir. 1993).

**II. Discussion**

## A. Breach of Employment Contract Claim

By agreement of the parties, Indiana law governs the Agreement. "[U]nless the contract provides otherwise, all applicable law in force at the time the agreement is made impliedly forms a part of the agreement without any statement to that effect." *Van Prooyen Builders, Inc. v. Lambert*, 907 N.E.2d 1032, 1035 (Ind. Ct. App. 2009). Indiana law sets out three *prima facie* elements for a breach of contract claim: the existence of a contract, the defendant's breach thereof, and damages. *Niezer v. Todd Realty, Inc.*, 913 N.E.2d 211, 215 (Ind. Ct. App. 2009). In reviewing the complaint for these elements, "we are not obliged to ignore any facts . . . that undermine the plaintiff's claim or to assign any weight to unsupported conclusions of law." *In re Wade*, 969 F.2d 241, 250 (7th Cir. 1992) (citation omitted). Nevertheless, we must consider that Indiana law permits any party to disagree as to the interpretation of a contract. Courts have refused to consider such disagreement a "breach," even if the party is incorrect. *Willsey v. Peoples Fed. Sav. & Loan Ass'n of E. Chi.*, 529 N.E.2d 1199, 1208 n.7 (Ind. Ct. App. 1988) (citing cases).

In Count One of the First Amended Complaint, the Company alleges that Mr. Marsh breached his obligations to the Company as stated in the Agreement. The Company further states that Mr. Marsh's alleged misrepresentations and concealment of his actions prevented it from terminating Mr. Marsh's employment for cause. Mr. Marsh rejoins that Section 12.7 of the Agreement controls here. He asserts that this section precludes the Company from seeking to recoup severance payments it has already made

to him (in Counts I and III); moreover, he argues that the Company cannot seek to offset or make claims related to amounts due or previously paid for any reasons whatsoever. Mr. Marsh argues that this provision operates as a release of the Company's claims, entitling him not only to defeat the allegations against him in the First Amended Complaint, but also to prevail on his Amended Counterclaim.

Mr. Marsh also contends that his alleged misconduct was well known to the pre- and post-sale Boards before the decision to terminate his employment was made, but that nonetheless, the post-sale Board chose to terminate him in 2006 without cause pursuant to Section 7.4 of the Agreement. Thus, in his view, the effect of that "without cause" determination was to trigger his entitlements under Section 12.7 of the Agreement. Mr. Marsh alleges that although he was entitled to $4,456,800 by virtue of the Salary Continuation Benefit provided under Section 7.4, the Company has paid him only $2,285,540 of that amount and has refused to pay him the remaining $2,171,260 as well as the other benefits to which he believes he is entitled under Section 7.4.

The Company disputes Mr. Marsh's claim that Section 12.7 creates an "absolute and unconditional" obligation to pay him severance benefits and counters that this provision does not serve as a release of any and all claims it had against its former CEO. It maintains that Section 12.7 governs only "payment obligations the Company actually had under the Employment Agreement" and that only "payments made hereunder" are deemed final obligations. Because the Agreement neither authorized Mr. Marsh to use certain funds as he did nor insulated him from liability for having done so, the Company

13

asserts that the misappropriations by Mr. Marsh for his own personal benefit were not "paid under" the Agreement. Thus, the Company vigorously denies that Section 12.7 applies to Counts I or II of the First Amended Complaint. The Company also argues that if this provision were interpreted to provide Mr. Marsh contractual immunity for his intentional or even criminal wrongdoing, it would be unenforceable as contrary to public policy. In any event, the Company states that in no sense does Section 12.7 constitute a release by the Company of any and all claims against Mr. Marsh for his actions, including any criminal wrongdoing of which he may be found guilty. The Company further contends that when the Court rules on the ERISA claims, the Company may be entitled to equitable relief depending on the facts adduced at trial and that, in truth, all of the issues raised in the First Amended Complaint and the Amended Counterclaim turn on facts that cannot be resolved by the Court on summary judgment.

For Section 12.7 to apply so as to create an absolute and unconditional entitlement inuring to the benefit of Mr. Marsh depends on whether the Company was obligated under the terms of the Agreement itself to make the extra-contractual payments, arrangements, and benefits. Certainly, the Company was obligated to pay in full whatever payments were actually due to Mr. Marsh under the Agreement. But payments made to Mr. Marsh not contemplated by the Agreement need not to have been paid, nor can they be recouped by him on the basis of breach of contract or fraud. There is a genuine factual dispute about whether the kinds of payments Mr. Marsh received allegedly for his own personal aggrandizement and pleasure arose under the Agreement

or whether they were in fact extra-contractual payments. Because the damages the Company seeks to recover under its breach of contract and fraud and deceit claims stem from alleged misappropriations by Mr. Marsh and his abuse of authority as CEO, it does not appear that such damages are related to any payment obligations the Company actually had under the Agreement. These damages were the result of non-ERISA compensation and benefits that Mr. Marsh erroneously or wrongfully caused the Company to pay him and arguably far exceeded any entitlement to him under the Agreement.

Having carefully reviewed the submissions of the parties, we conclude that different sets of factual recitations underlie each side's arguments.[7] The facts in dispute are material because they could potentially affect the outcome of this lawsuit under the governing law. *Ferrell v. Mills*, No. 4:11-cv-018-SEB-TAB, 2012 WL 442806, at *1 (S.D. Ind. Feb. 10, 2012). We briefly discuss these facts to illustrate why a grant of summary judgment is unavailable, at least at this juncture.

The Court initially observes some dispute regarding the Company's expectations of Mr. Marsh as its CEO. As we have alluded to above, the Agreement's description of his duties is couched in very general terms. The brevity of this description appears, for instance, to have resulted in divergent understandings of expectations regarding use of the Company plane—which is not mentioned in the Agreement—and how such expectations

_____

[7]Of course, at the summary judgment stage we construe all disputed facts in the light reasonably most favorable to the Company as the party opposing the motion.

and assumptions might intersect with Section 6 of the Agreement. Mr. Marsh contends that he "made no representations to the [Compensation C]ommittee about the [A]greement." Def.'s Br. at 7. The Company rejoins that Mr. Marsh manifested an understanding "that the Company was agreeing to pay . . . only for business expenses that were within the scope of [Section] 6 . . . [and that he] had front-line responsibility to ensure that the expenses he submitted to the Company for payment . . . were ordinary and necessary business expenses." Pl.'s Br. at 5.

We acknowledge, of course, that Indiana does not impute into every contract a duty of good faith. *Lewis v. Methodist Hosp., Inc.*, 205 F. Supp. 2d 987, 994 (N.D. Ind. 2002) (citing *First Fed. Sav. Bank of Ind. v. Key Markets, Inc.*, 559 N.E.2d 600, 604-05 (Ind. 1990)), *rev'd on other grounds*, 326 F.3d 851 (7th Cir. 2003). This duty arises "in limited circumstances" such as when a fiduciary relationship exists or where contracts are ambiguous as to the application of the covenants. *First Fed. Sav. Bank of Ind.*, 559 N.E.2d at 604-05; *Coates v. Heat Wagons, Inc.*, 942 N.E.2d 905, 918 (Ind. Ct. App. 2011). Indiana views employment as a "species of agency relationship" such that "[t]he employee owes fiduciary duties to the employer." *N. Ind. Pub. Serv. Co. v. Bloom*, 847 N.E.2d 175, 187 (Ind. 2006) (citing REST. (THIRD) OF AGENCY §§ 2 cmt. a, 1 (1958)). Among these duties are a duty of loyalty to one's employer and a duty to avoid self-serving conduct. *Coates*, 942 N.E.2d at 918. The Indiana state courts have articulated this duty as a requirement that both parties to an employment contract display good faith in their conduct toward each other and that an employee must "honestly and in good faith

16

carry out the contract as he underst[ands] it . . . so as to carry out the work to the best interest of the employer." *Potts v. Review Bd. of Ind. Emp't Sec. Div.*, 475 N.E.2d 708, 711 (Ind. Ct. App. 1985) (quoting *H.C. Bay Co. v. Kroner*, 149 N.E. 184, 185 (Ind. Ct. App. 1925)). In light of these implied contractual duties and the broad manner in which the express duties are set out in the Agreement, we are not fully equipped at present to rule on the issue of breach. Accordingly, a more thorough fleshing-out of the facts at trial is required.

Facts regarding the Board's investigation of Mr. Marsh are also disputed. There is ostensibly some gray area as to when the investigation concluded. The Company alleges that the Board could not complete its inquiry into its financial state before Sun Capital acquired it. Pl.'s Br. at 26. Mr. Marsh's position is simply that "the Board took no further action with respect to [his] executive expenses before the sale." Def.'s Br. at 13. We suspect that this issue stems from disagreement over whether there is any meaningful difference between the pre- and post-sale Company. Whereas the Company freely references the "pre-sale Board" and its allegedly unfinished investigation, Mr. Marsh contends that "[t]here is no 'pre-sale' Marsh . . . distinct from the 'post-sale' Marsh," which supports his argument that "Marsh knew what it knew even though its ownership changed." Def.'s Reply at 4. Because facts of this nature may affect the determination of whether the Company deviated from any duties it may have owed Mr. Marsh under the Agreement, we reassert the necessity of setting this matter for trial.

Moreover, the facts regarding the nature of Mr. Marsh's expenditures are

themselves hotly disputed.  Mr. Marsh has conceded only that one must assume the

Company's version of the facts are true for the purpose of the Court's interpretation of

Section 12.7, which he hopes will grant him some sort of immunity for his actions.

However, in no way does he agree that the Company's factual recitations *are* true.  The

task of deciding whether certain expenditures breached the Agreement is therefore

outside the realm of summary judgment.  A few examples of facts which are likely to

require disentanglement prior to any final judgment is rendered are: (1) whether Mr.

Marsh inappropriately obtained Company funds "for trips that [he] did not [himself]

attend, *see* Def.'s Reply at 5; (2) whether causing the Company to incur costs of sending

family members or friends of Mr. Marsh on sundry trips around the world "relate[d] to

the Company's business specifically or business generally" as specified by the

Agreement, *see* Agrmt. at 4; and (3) whether information related to Mr. Marsh's travel

expenditures was intentionally destroyed.  These facts will be determinative not only on

the issue of breach, but also on whether Mr. Marsh's alleged acts were egregious enough

to support the Company's request for punitive damages in its fraud and deceit claim.

We have previously stated that there is no mistaking the parties' dispute as to Mr.

Marsh's beliefs on the import of Section 12.7 to his contract.  Our view of the provision is

that Section 12.7 does not constitute a release in the sense that Mr. Marsh argues.  Under

Indiana law, a release is a surrender of a claimant's right to bring a cause of action.  *W.*

*Ohio Pizza, Inc. v. Clark Oil & Ref. Corp.*, 704 N.E.2d 1086, 1091 (Ind. Ct. App. 1999).

The court must construe a release like any other contract, which involves carrying out the

parties' intent. "That intent is disclosed by the language the parties used to express their rights and duties considered in light of all the facts and circumstances." *Id.* (quoting *Wright Motors, Inc. v. Marathon Oil Co.*, 631 N.E.2d 923, 925 (Ind. Ct. App. 1994)). Absent ambiguity, the construction of a release is considered a matter of law for the court's interpretation. *Lechner v. Reutepohler*, 545 N.E.2d 1144, 1147 (Ind. Ct. App. 1989).

Both the Company and Mr. Marsh invite the Court to analyze Section 12.7 and conclude that it supports their respective viewpoints. Mr. Marsh pays special attention to the words "absolute," "unconditional," and "final," while the Company focuses on terms such as those in the release in *Cooper v. Robert Hall Clothes, Inc.*, 390 N.E.2d 155, 156 (Ind. 1979), *abrogated by statute on other grounds*, which "are noticeably absent from [Section] 12.7." Pl.'s Br. at 39 n.21. We are not persuaded by either of these arguments; as Mr. Marsh himself acknowledges, no special language must appear in a contract to create a release. *See Landers v. McComb Window & Door Co.*, 248 N.E.2d 358, 363 (Ind. Ct. App. 1969). Nor does public policy prevent parties "from agreeing in advance that one . . . shall not be liable for the consequences of conduct that would otherwise be negligent." *Lechner*, 545 N.E.2d at 1148. Still, it would contravene the very purpose of releases "[i]f judges could interpret a release to mean something that is contrary to the plain language." *Zollman v. Geneva Leasing Assocs.*, 780 N.E.2d 387, 393 (Ind. Ct. App. 2002) (quoting *Estate of Spry v. Greg & Ken, Inc.*, 749 N.E.2d 1269, 1275 (Ind. Ct. App.

2001)).  The Court can make no such interpretation, at least at this stage in the proceedings.

It is not our province to "construe clear and unambiguous provisions . . . [or] add provisions not agreed upon by the parties."  *Moore v. Wells Fargo Constr.*, 903 N.E.2d 525, 531 (Ind. Ct. App. 2009).  Rather, we seek to give effect to the parties' intent as reasonably indicated by the language of their Agreement.  Section 12.7 requires the Company to surrender its right to bring claims challenging "[a]ll amounts payable by the Company" under the Agreement.  This much, in our view, is clear and unambiguous.  We have already indicated that whether the monies Mr. Marsh has received were properly paid within the scope of the Agreement is a genuine issue of material fact.  Given that we are foreclosed from rewriting the Agreement for the parties, *see Commercial Bankers Life Ins. Co. of Am. v. Smith*, 516 N.E.2d 110, 113 (Ind. Ct. App. 1987), we decline to interpret Section 12.7 as impermeable armor protecting Mr. Marsh's alleged entitlements at the summary judgment stage.  The issue of what claims, if any, may be barred by this provision will require further development of the disputed facts at trial.

## B.  Fraud and Deceit Claim

The elements of fraud under Indiana law are:  (1) a false statement of past or existing material fact; (2) made with the knowledge of its falsity or made recklessly without knowledge of its truth or falsity; (3) made for the purpose of inducing the other party to act upon it; and (4) upon which the other party did justifiably rely and act; which

(5) proximately causes injury to the other party. *Rice v. Strunk*, 670 N.E.2d 1280, 1289 (Ind. 1996). Constructive fraud "encompasses several related theories, all of which are based on the premise that there are situations which might not amount to actual fraud, but which are 'so likely to result in injustice that the law will find a fraud despite the absence of fraudulent intent.'" *Stoll v. Grimm*, 681 N.E.2d 749, 757 (Ind. Ct. App. 1997) (quoting *Scott v. Bodor, Inc.*, 571 N.E.2d 313, 324 (Ind. Ct. App. 1991)). Claims sounding in constructive fraud require a showing of:

> (1) a duty owing by the party to be charged to the complaining party due to their relationship; (2) violation of that duty by the making of deceptive material misrepresentations of past or existing facts or remaining silent when a duty to speak exists; (3) reliance thereon by the complaining party; (4) injury to the complaining party as a proximate result thereof; and (5) the gaining of an advantage by the party to be charged at the expense of the complaining party.

*Fiederlein v. Boutselis*, 952 N.E.2d 847, 860 (Ind. Ct. App. 2011). For instance, constructive fraud may exist where one party takes unconscionable advantage of his position in a fiduciary relationship. *Stoll*, 681 N.E.2d at 757.

In Count Two of the First Amended Complaint, the Company reasserts allegations from Count One and also states that Mr. Marsh's actions related to the Company's e-voucher procedure, petty cash system, and jet "were calculated to conceal and did conceal Mr. Marsh's use of Company funds." First Am. Compl. ¶ 53. With respect to damages, the Company states that "[a]s a proximate result of [Mr. Marsh's allegedly fraudulent actions], Marsh Supermarkets has suffered damages and has paid Mr. Marsh compensation and benefits to which he was not entitled, and Mr. Marsh has been unjustly

enriched." *Id.* ¶ 55.

Returning to Section 12.7, we conclude that even if this provision were interpreted to foreclose the Company's claims against Mr. Marsh, a public policy exception to enforceability would render this provision unenforceable if it is determined that Mr. Marsh defrauded the Company. This issue also must be resolved on the basis of the facts which are clearly in dispute at this preliminary stage of the case.

The Company's fraud claim also necessarily calls forth the issue of potential remedies available in this action. Under Indiana law, it is well-settled that "punitive damages are not allowed in a breach of contract action." *Miller Brewing Co. v. Best Beers of Bloomington, Inc.*, 608 N.E.2d 975, 981 (Ind. 1993). Only "where the conduct of the breaching party independently establishes the elements of a common law tort, and where the proven tort is of the kind for which punitive damages are allowed" are punitive damages available. *Id.* (citation omitted). Thus, the question before us is whether the Company has demonstrated the existence of an independent tort—namely, fraud. *See Puller Mortg. Assocs., Inc. v. Keegan*, 829 F.Supp. 1507, 1519 (S.D. Ind.1993) (recognizing fraud as a type of tort permitting the award of punitive damages). We note that under Indiana law, a party who brings both a breach of contract and a fraud claim must prove that "(1) the breaching party committed the separate independent tort of fraud; and (2) the fraud resulted in injury distinct from that resulting from the breach." *Am.'s Directories, Inc. v. Stellhorn One Hour Photo, Inc.*, 833 N.E.2d 1059, 1067 (Ind. Ct. App.

2005) (citing *Tobin v. Ruman*, 819 N.E.2d 78, 86 (Ind. Ct. App. 2004)).

With respect to its fraud and deceit claim, the Company suggests that it may be entitled to the remedies of a constructive trust or restitution. The Indiana Supreme Court has stated that a constructive trust may be imposed where a person holding property

> is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it. The duty to convey the property may rise because it was acquired through *fraud*, duress, undue influence or mistake, or through a *breach of fiduciary duty* . . . . The basis of the constructive trust is the unjust enrichment which would result if the person having the property were permitted to retain it.

*Melloh v. Gladis*, 309 N.E.2d 433, 438 (Ind. 1974) (emphases added). Either actual or constructive fraud is a prerequisite to the imposition of this equitable remedy. *See Zoeller v. E. Chi. Second Century, Inc.*, 904 N.E.2d 213, 222 (Ind. 2009); *Kalwitz v. Estate of Kalwitz*, 822 N.E.2d 274, 280 (Ind. Ct. App. 2005). Restitution is available where "no contract exists," *Wenning v. Calhoun*, 827 N.E.2d 627, 630 (Ind. Ct. App. 2005), which is to say if the factfinder concludes that Mr. Marsh's conduct was so egregious as to vitiate the Agreement. A party seeking this equitable remedy must show that: (1) a benefit was rendered to the opposing party; (2) at the other party's implied request; and (3) under circumstances in which "equity should demand that the person receiving the benefit should compensate the other in order to prevent unjust enrichment." *Id.* Although we concede that these remedies may eventually prove appropriate in the instant litigation, we make no decisions at this stage as to their applicability. The disputed facts must first be

presented to a jury regarding whether any of the alleged conduct in this lawsuit amounts to fraud and deceit.

## C. Remaining Counts

Whether the Company ultimately is entitled to equitable relief under ERISA that might include a *post hoc* right to terminate Mr. Marsh "for cause" based on his misconduct or fraud and deceit, as a form of retroactive administration of his post-employment rights (or reformation of the contract), again turns on facts yet to be proven at trial. If such a determination is made, the Company may be able to show an entitlement to recover for restitution of the Salary Continuation Benefit payments already made to Mr. Marsh. Similarly, the evidence may be sufficient to support the Company's entitlement to an offset and/or recovery for breaches of Mr. Marsh's fiduciary duties, his theft, deception, and conversion. But the Court cannot make such a determination without a decision by a properly impaneled and instructed jury. Nor is such a determination possible at this time with respect to Mr. Marsh's ERISA counterclaim.

Finally, we withhold a ruling on Mr. Marsh's declaratory judgment request seeking an order of enforcement of the provision in the Agreement that would make the Company liable for the costs and fees associated with this litigation. We agree with the Company that Mr. Marsh's arguments regarding Section 11.1 parallel those advanced in support of his views on Section 12.7 and thus cannot properly be resolved at the summary judgment stage. If a jury concludes that the contract is not enforceable based on the facts

at issue here and the interests of public policy, this provision obviously would die with the remainder of the Agreement.

## Conclusion

For the reasons detailed in this entry, we cannot conclude based on the record before us that "no genuine issue as to any material fact" exists regarding any of the counts set forth in the parties' briefs and that judgment is appropriate as a matter of law. Summary judgment as to all counts at issue in Defendant's motion is accordingly DENIED, and the parties accordingly shall continue their preparations for trial.

IT IS SO ORDERED.

Date: _____03/08/2012_____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Linda Joy Cooley
KRIEG DEVAULT, LLP
lcooley@kdlegal.com

Winthrop James Hamilton
BOSE MCKINNEY & EVANS, LLP
jhamilton@boselaw.com

David K. Herzog
FAEGRE BAKER DANIELS LLP - Indianapolis
david.herzog@faegrebd.com

Ryan Michael Hurley
FAEGRE BAKER DANIELS LLP - Indianapolis
ryan.hurley@FaegreBD.com

Jonathan Lamont Mayes
BOSE MCKINNEY & EVANS, LLP
jmayes@boselaw.com

Andrew M. McNeil
BOSE MCKINNEY & EVANS, LLP
amcneil@boselaw.com

C. Joseph Russell
KRIEG DEVAULT LLP
crussell@kdlegal.com

Munjot  Sahu

FAEGRE BAKER DANIELS LLP - Indianapolis

munjot.sahu@faegrebd.com