UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| MARSH SUPERMARKETS, INC., )<br>       Plaintiff/Counterclaim )<br>       Defendant, )<br>       )<br>   vs. )<br>       )<br>DON E. MARSH, )<br>       Defendant/Counterclaim )<br>       Plaintiff. )<br>_____ )<br>       )<br>DON E. MARSH, )<br>       Third Party Plaintiff, )<br>       )<br>   vs. )<br>       )<br>EMPLOYMENT AGREEMENT BY AND )<br>BETWEEN DON E. MARSH AND MARSH )<br>SUPERMARKETS, INC., )<br>       Third Party Defendant. ) | 1:09-cv-00458-SEB-TAB |

**ORDER ON POST-TRIAL CLAIMS**

This matter is before the Court for decision on several issues not resolved during the recent

ten-day jury trial.   On February 15, 2013, the jury returned a verdict finding (1) that Don E. Marsh

("Mr. Marsh") breached his employment agreement ("the Employment Agreement") with Marsh

Supermarkets, Inc. ("the Company"); (2) that Mr. Marsh committed actual and constructive fraud

against the Company;[1]  and (3) that the Company did not file a false tax information claim with the

Internal Revenue Service against Mr. Marsh.   The jury awarded damages to the Company in the

amount of $1,400,000 on its breach of contract claim and $800,000 on its fraud claim.   Various

---

[1]With respect to the harm suffered by the Company resulting from Mr. Marsh's actual and
constructive fraud, the jury determined that Mr. Marsh was 50% at fault and the Company was
50% at fault.

1

equitable issues were reserved for subsequent decision by the Court.   Having thoroughly reviewed the evidence adduced at trial and the parties' post-trial submissions, we now address and resolve the remaining issues in this protracted conflict.   The residual claims and counterclaims before us are the following:

(1)  whether the Company is entitled to equitable relief under ERISA § 502(a)(3) (Count III of the Company's Amended Complaint);

(2)  whether Mr. Marsh is entitled to equitable relief under ERISA § 502(a)(3) (Count I of Mr. Marsh's Amended Counterclaim);

(3)  whether the Company breached Mr. Marsh's Employment Agreement (Count II of Mr. Marsh's Amended Counterclaim); and

(4)  whether Mr. Marsh and/or the Company is entitled to recover attorneys' fees and costs under ERISA § 502(g) (Count VI of Mr. Marsh's Amended Counterclaim).

## I.  Findings of Fact

Despite the Court's familiarity with the parties' positions on these issues, we begin with a brief reprisal of the salient facts.   The February jury trial commenced as the culmination of what had become a widely publicized standoff between the Company and its former Chief Executive Officer (CEO).   Copious evidence was introduced by the Company to demonstrate that Mr. Marsh inappropriately dipped into corporate coffers for years to finance a "lifestyle of the rich and famous."   To that end, the Company contended that Mr. Marsh exploited an "e-voucher" system through which he self-classified entries on his credit card statements and invoices, and received full reimbursement from the Company for expenses not earmarked by him as "personal."[2]   Mr. Marsh's self-conducted classification system, it should be noted, was liberal in his favor.   The

_____

[2]Pressed repeatedly to state any criteria he used to classify his expenses, Mr. Marsh testified (with obvious indignation) that he relied on his "gut factor," which explanation he expected the Company to accept.

2

Company's accounting department did not review Mr. Marsh's representations to ensure that such expenses were properly reimbursable or otherwise payable.   Under this system, which afforded him virtually unfettered discretion, Mr. Marsh spent millions of Company dollars on hunting expeditions, lavish gifts, spa services, dalliances with several paramours, elaborate Christmas cards, and family vacations, most of which also included his personal uses of the Company plane.[3]

Mr. Marsh's extensive misappropriations eventually brought the Company to the point of financial collapse, which fact became known to the Board of Directors ("the Board") following John Elbin's installation as Chief Financial Officer (CFO) in July 2005.   Mr. Elbin's investigation of the Company's financial crisis and threatened demise (and the extent to which Mr. Marsh's conduct[4] affected this breakdown) informed two major corporate changes:   (1) the sale of the Company to Sun Capital Partners, Inc., and (2) Sun Capital's installation of Frank Lazaran as the Company's new CEO.   In late 2005 and early 2006, the Board first learned the details of the "e-voucher" system based in major part on a four-year expense report prepared by accountant Steve May.   Former CFO Doug Dougherty discussed the contents of Mr. May's report (and his view that Mr. Marsh's expenses were exorbitant) with several members of the Board during this time.   Sun Capital, with knowledge of these facts, officially acquired the Company in September 2006, and on September 28, 2006, Mr. Lazaran sent a letter terminating Mr. Marsh's employment "without cause."

Because the seeds of this litigation were planted by Mr. Marsh's termination, a focal point of our rulings here is the Employment Agreement entered into by the Company and Mr. Marsh.

---

[3]This short catalog barely scratches the surface of Mr. Marsh's spending practices.
[4]Mr. Marsh's son, David Marsh, who had held the position of Chief Operating Officer (COO), was also terminated—also "without cause"—for similar patterns of financial abuses shortly after the results of Mr. Elbin's investigation came to light.

In fact, that form of agreement was utilized by the Company for all its senior executives.   Drafted in 1999 by the Company's counsel,[5] Mr. Marsh's five-year Employment Agreement automatically renewed annually, barring either party's written notice to the other of termination or Mr. Marsh's voluntary retirement.   Paragraph 3 of the Employment Agreement required Mr. Marsh to "perform all of the duties associated with" the positions of Chairman of the Board, President, and CEO of the Company.   Emp't Agrmt. at 2.   Although his responsibilities were "personal to the Executive," he was to report regularly to the Board and its executive committees. *Id.* at 3, 11.   The Employment Agreement specified that Mr. Marsh was entitled to submit claims to the Company for reimbursement, but limited those claims to "up to a maximum of Ten Thousand Dollars ($10,000) per calendar year" with respect to "reasonable professional expenses" he incurred "for personal and estate tax and financial planning services."   *Id.* at 4 (Paragraph 5.7(c)).   Likewise, he was entitled to a refund for certain business expenses he incurred, but only the "ordinary and necessary business expenses, in a reasonable amount" arising from his duties under the Employment Agreement.   *Id.* at 5 (Paragraph 6).   The portion of the verdict pertaining to the Company's breach of contract claim reflects the jury's finding that Mr. Marsh breached Paragraphs 3, 5.7(c), and 6 of the Employment Agreement.   Verdict Form at 2-3.

Whether classified as "for cause" or "without cause," terminations from the Company were governed by Article 7 of the Employment Agreement.[6]   Paragraph 7.3 governed termination "for cause" by the Board based on any of the grounds specified in Paragraph 8.1:

---

[5]At all relevant times in this lawsuit, the Company has been represented by attorneys from Faegre Baker Daniels LLP.   This law firm previously conducted business as Baker & Daniels LLP.   *See* Docket No. 135 (notification of change of law firm name).

[6]Pursuant to the Employment Agreement, termination could also occur if the Executive became disabled, upon his retirement, or in the event of his death.

4

(a) the willful and continued failure of [Mr. Marsh] to perform substantially [his] duties owed to the Company after a written demand for substantial performance is delivered to [him] which specifically identifies the nature of such non-performance; (b) the willful engaging by [Mr. Marsh] in gross misconduct significantly and demonstrably injurious to the Company; or (c) conduct by [Mr. Marsh] in the course of his . . . employment which is a felony or fraud that results in material harm to the Company.    No act or omission on the part of [Mr. Marsh] shall be considered "willful" unless it is done or omitted in the best interests of the Company.

Emp't Agrmt. at 8 (Paragraph 8.1, defining the term "cause").    Paragraph 7.4 permitted the Board

to terminate Mr. Marsh's employment "without cause" at any time during the term, which

prerogative Mr. Lazaran exercised on behalf of the Board in September 2006.    Additionally, the

Employment Agreement detailed the terms of any ensuing financial disbursement(s) by the

Company to Mr. Marsh based on the type of termination.    A "for cause" termination required the

Company to pay Mr. Marsh the portion of his base salary earned through the date of termination as

well as a bonus.    *Id.* at 6 (Paragraph 7.3).    By contrast, termination "without cause" involved a

more generous and lucrative payout:

> (1) the above-mentioned base salary and bonus payments;
> (2) the "Salary Continuation Benefit"[7] (for a period of five years from the date of termination);
> (3) life, medical, dental, accident, and disability insurance coverage;
> (4) lifetime medical benefits for Mr. and Mrs. Marsh;
> (5) premiums due on Mr. Marsh's split-dollar life insurance policy;
> (6) a "grossed-up" bonus to reimburse Mr. Marsh for any taxes attributable to his premiums and bonus payments; and
> (7) the automobile listed as one of Mr. Marsh's perquisites in Paragraph 5.7(a).

*Id.* at 6-7 (Paragraph 7.4).

Many of the remaining provisions of the Employment Agreement were routine contract

---

[7]Paragraph 8.7 defined the Salary Continuation Benefit as "an annual amount equal to the sum of:   (a) the highest annualized Base Salary of [Mr. Marsh] in effect at any time within five (5) years prior to the date of termination; plus (b) the largest of the annual bonuses paid to [Mr. Marsh] for the ten (10) years preceding the termination date."   Emp't Agrmt. at 10.

inclusions and, as such, have not been disputed by either party.   The glaring

exceptions—Paragraphs 11.1 and 12.7—govern the vital issues of dispute resolution and payment

obligations and are hotly disputed.   Paragraph 11.1 delegated the choice of arbitration or litigation

to Mr. Marsh and, without qualification, stated:   "All of [Mr. Marsh]'s costs and expenses of

litigation or arbitration, including attorney's fees, shall be borne by the Company and paid as

incurred, whether or not [Mr. Marsh] prevails in the litigation or arbitration."   Emp't Agrmt. at

11-12 (Paragraph 11.1).   On May 18, 2012, we issued a pre-trial ruling addressing Paragraph

11.1, holding as follows:

> [W]e have a properly executed employment agreement that obligates the employer to pay
> the covered employee's attorneys' fees in any good faith contractual dispute as they are
> incurred, without regard to the ultimate outcome. . . . [T]o the extent that the Employment
> Agreement has ERISA provisions, such provisions trump state law claims such as breach
> of contract or fraud.   We therefore conclude that [Paragraph] 11.1 obligates the Company
> to pay Mr. Marsh's past, present, and future attorneys' fees related to litigation of the
> ERISA portion of this dispute . . . [but only] such attorneys' fees as they are incurred.

Docket No. 146 at 9 (order granting Mr. Marsh's motion for reconsideration).

Ultimately, throughout this lawsuit, Paragraph 12.7 has been the proverbial basket into

which Mr. Marsh has placed all of his eggs.   This component of the Employment Agreement,

characterized as a "hell or high water" provision by Mr. Marsh, was similar to Paragraph 11.1 in

terms of its unequivocal, unambiguous terms:

> The Company's obligation to make the payments and the arrangements and benefits
> provided for or referred to herein shall be absolute and unconditional, and shall not be
> affected by any circumstances, including, without limitation, any offset, counterclaim,
> recoupment, defense or other right which the Company may have against [Mr. Marsh] or
> anyone else. All amounts payable by the Company hereunder shall be paid without notice
> or demand. Each and every payment made hereunder by the Company shall be final, and
> the Company shall not seek to recover all or any part of such payment from [Mr. Marsh] or
> from whosoever may be entitled thereto, for any reasons whatsoever.
>
> [Mr. Marsh] shall not be obligated to seek other employment in mitigation of the amounts

payable or arrangements made under any provision of this Agreement, and the obtaining of any such other employment shall in no event effect any reduction of the Company's obligations to make the payments and arrangements required to be made under this Agreement.

Emp't Agrmt. at 13 (Paragraph 12.7).   According to Mr. Marsh, Paragraph 12.7 effectively

rendered his ERISA benefits nonforfeitable.   He was therefore more than a little indignant when,

following an extensive investigation of past financial practices, the Company's post-sale Board

stopped tendering Salary Continuation Benefit payments to him based on his "tremendous misuse

of Company assets."   Pl.'s Post-Trial Br. at 14.   These payments ceased in May 2008, at which

time Mr. Marsh had received Salary Continuation Benefit payouts in the total amount of

$2,056,984.57 and lifetime medical benefit payouts in the total amount of $17,067.07.   *Id.* at 14,

19.   Nearly one year later, after efforts failed to effect a negotiated settlement of the parties'

differences, the Company filed suit against Mr. Marsh.   Once subsequent attempts to settle the

lawsuit foundered, the parties proceeded to trial on February 4, 2013.

Lest this introduction begin to sound like an infomercial ("But wait! There's more!"),[8]  we

note again that several post-trial issues currently pend before the Court.   As we have come to

expect, the answers and varieties of relief requested by the Company and Mr. Marsh diverge

considerably.   The Company stands by its original argument that Mr. Marsh "snookered [it] into

terminating [his] employment without cause and then paying him over $2 million in Salary

Continuation Benefits when, by any reasonable analysis of facts now proven, Mr. Marsh should

have been terminated for cause and would have been but for his fraud" and/or material breach of

the Employment Agreement.   Pl.'s Post-Trial Br. at 18.   Accordingly, the Company seeks

---

[8]*See* TIM SAMUELSON, BUT WAIT! THERE'S MORE!:   THE IRRESISTIBLE APPEAL AND SPIEL OF RONCO AND POPEIL (2012).

retroactive administration of the ERISA plan contained in the Employment Agreement such that: (1) Mr. Marsh's termination is re-classified as "for cause;" (2) the Company is no longer obligated to pay Mr. Marsh's Salary Continuation Benefit or lifetime medical benefits; and (3) Mr. Marsh must reimburse the Company in the amount of (a) approximately $1.79 million in premium payments on his split-dollar life insurance policy, (b) $2,056,984.57 in Salary Continuation Benefit payments, and (c) $17,067.07 in lifetime medical benefit payments.[9]  *Id.* at 19.   The Company also requests a finding that it is not liable to Mr. Marsh for breach of the Employment Agreement based on its cessation of post-termination benefit payments.   Finally, the Company asks the Court for an award of all of its attorneys' fees and costs.   For his part, Mr. Marsh seeks an entry of judgment (1) awarding him $2,171,261.48 as equitable relief under Section 502(a)(3) of the Employee Retirement Income Security Act (ERISA); (2) resolving his breach of contract and declaratory judgment counterclaims regarding attorneys' fees in his favor; (3) vacating the jury's verdict concerning the Company's fraud and breach of contract claims; and (4) resolving the Company's ERISA § 502(a)(3) claim in his favor.

## II.  Conclusions of Law

Without intending to signal what we might have done as the trier of fact, we begin our analysis by affirming the propriety of the jury's verdict.   Faced with evidence that was sufficiently tangled with factual disputes so as to preclude summary judgment, the jury, in our view, was adequately instructed on the issues entrusted to it for decision and rendered a reasonable verdict.   That the verdict did not contravene the weight of the evidence, impose excessive damages, reflect obvious unfairness at trial, or shock the judicial conscience further corroborates

---

[9]This value is based on payments made for Mr. and Mrs. Marsh as of December 16, 2012.

its soundness.   *See Westchester Fire Ins. Co. v. Gen. Star Indem. Co.*, 183 F.3d 578, 582 (7th Cir. 1999).   Thus, although other reasonable outcomes could feasibly have resulted from the two-week trial, we will not vacate the jury's verdict.   We are, accordingly, bound by the facts found jointly by those six jurors.   *Int'l Fin. Servs. Corp. v. Chromas Techs. Can., Inc.*, 356 F.3d 731, 735 (7th Cir. 2004) ("[T]he jury's determination of factual issues common to both the legal and equitable claims . . . bind[s] the court."); *Miles v. Indiana*, 387 F.3d 591, 599 (7th Cir. 2004) ("The judge is bound by the issues necessarily decided by the jury.").

Pursuant to Federal Rule of Civil Procedure 49(a), our next task is to "apply[ ] appropriate legal principles to the facts found by the jury; it is for the [C]ourt to decide upon the jury's answers [and] the jury's special verdicts . . . what the resulting legal obligation is."   *Freeman v. Chi. Park Dist.*, 189 F.3d 613, 616 (7th Cir. 1999) (discussing a district court's function when a jury completes a verdict form containing special interrogatories).   As mentioned, disposition of the relevant legal obligations at summary judgment was inappropriate because of then-existing genuine issues of material fact underlying Mr. Marsh's misconduct.   Two weeks' worth of trial testimony and evidence definitively removed these factual stumbling blocks from our analytical path.   Stated otherwise, our acceptance of the jury's verdict means that all further consideration of the issues by the Court stems from the following basic premises:

- Mr. Marsh breached his Employment Agreement by failing to perform all duties associated with his former positions at the Company and failing to seek reimbursement from the Company for reasonable business expenses[10] and only a maximum of $10,000 of annual reasonable tax and financial planning expenses;
- Damages in the amount of $1,400,000 would compensate the Company for the foregoing breaches of the Employment Agreement by Mr. Marsh;

---

[10]Specifically, the jury concluded that Mr. Marsh failed to submit "only the 'ordinary and necessary business expenses, in a reasonable amount' which [he] incurred in performing his duties under the Employment Agreement."   Verdict Form at 3.

- Mr. Marsh did *not* fail to "devote substantially his full time, attention, and energies to the Company's business" or to seek reimbursement from the Company for the costs of his various organizational memberships;
- The Company did not waive or release its breach of contract claim against Mr. Marsh, and was in no way barred from recovering on this claim;
- Mr. Marsh committed actual and constructive fraud against the Company by violating his obligation to deal fairly with the Company and by making false statements, misrepresentations, and/or other failures to disclose the true nature of his use of e-vouchers, the Company plane, petty cash, and/or per diem reimbursements;
- Damages in the amount of $800,000 would compensate the Company for the foregoing fraud against the Company by Mr. Marsh, for which Mr. Marsh was 50% at fault and the Company was 50% at fault; and
- No additional money damages were necessary to punish Mr. Marsh for his fraud and deter other persons from committing similar acts.

We now turn to a determination of whether—and, if so, how—the foregoing facts impact the parties' final legal obligations to one another in terms of countervailing ERISA arguments, attorneys' fees, and money damages owed.

**A.   Competing ERISA Claims**

Section 502(a) of the ERISA statute authorizes the filing of a civil action by "a participant, beneficiary, or fiduciary"[11] of an ERISA plan who seeks "appropriate equitable relief" in order to enforce "the terms of the plan."   29 U.S.C. § 1132(a)(3)(B)(ii).   The statute's definitional section specifies that a "plan" is "an employee welfare benefit plan or an employee pension plan or a plan which is both an employee welfare benefit plan and an employee pension benefit plan."   *Id.* § 1002(3).   As the Supreme Court observed in *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 8 (1987), these portions of the statute are tautological.   Likewise, the Seventh Circuit has instructed that, because "[ERISA]'s definitions of 'plan,' 'employee welfare benefit plan[,]' and 'employee

---

[11]For purposes of the instant lawsuit, we note that Mr. Marsh may be classified as a participant, beneficiary, or fiduciary under ERISA.   *See* 29 U.S.C. §§ 1002(7), (8), (14)(A).   The Company is considered a "fiduciary."   *Id.* § 1002 (14)(A) (defining "fiduciary" as " including, but not limited to, any administrator, officer, trustee, or custodian, counsel, or employee of such employee benefit plan").

pension benefit plan' all contain the word 'plan' within their definitions," courts must look beyond the statutory language to ascertain what constitutes an ERISA plan.   *Cvelbar v. CBI Ill. Inc.*, 106 F.3d 1368, 1374 (7th Cir. 1997), *abrogated on other grounds by Int'l Union of Operating Eng'rs v. Rabine*, 161 F.3d 427 (7th Cir. 1998).   Binding case law precedent indicates that an ERISA plan typically involves a continuing administrative scheme, *Fort Halifax Packing Co.*, 482 U.S. at 12, and reasonably ascertainable terms, *Diak v. Dwyer, Costello & Knox, P.C.*, 33 F.3d 809, 812 (7th Cir. 1994).   The latter of these two factors requires a determination of "whether[,] from the surrounding circumstances[,] a reasonable person could ascertain the intended benefits, beneficiaries, source of financing, and procedures for receiving benefits."   *Diak*, 33 F.3d at 812 (citing *Donovan v. Dillingham*, 688 F.2d 1367, 1373 (11th Cir. 1982)).   Ultimately, classifying an agreement (or provisions contained therein) as a qualified ERISA plan involves a fact-intensive analysis.[12]

Nearly four years ago, in what was apparently a rare moment of harmony, both parties conceded that ERISA governs only part of Mr. Marsh's Employment Agreement.   *See* Docket No. 25.   We recognized the same in our ruling on Mr. Marsh's motion for judgment on the pleadings, concluding that "the Employment Agreement is . . . a multi-faceted employment contract with some facets governed by ERISA and other facets governed by Indiana law."   Docket No. 58 at 9 (citing *Stearns v. NCR Corp.*, 297 F.3d 706, 710 (8th Cir. 2002)); *accord Balestracci v. NSTAR Elec. & Gas Corp.*, 449 F.3d 224, 229 (1st Cir. 2006).   Thus, we must identify what is—and, by extension, what is *not*—part of the ERISA plan within that contract.   According to the Company, only Paragraphs 7.3, 7.4, and 8.7 comprise the ERISA plan.   Mr.

---

[12]Even a plan tailored to one employee can properly qualify as an ERISA plan, although such arrangements require special scrutiny.   *E.g.*, *Cvelbar*, 106 F.3d at 1376.

Marsh, by contrast, contends that Paragraphs 7.4, 8.7, 11.1, 12.7, *and* "Section 8.1 as applied to Section 7.4" must all be considered part of the ERISA plan.   Def.'s Post-Trial Br. at 16.   This inquiry is crucial because federal law "supersede[s] any and all State laws insofar as they . . . relate to any employee benefit plan."   29 U.S.C. § 1144(a); *see also Collins v. Ralston Purina Co.*, 147 F.3d 592, 595 (7th Cir. 1998) ("ERISA . . . preempts a state law claim if the claim requires the court to interpret or apply the terms of an employee benefit plan.").   As a result, provisions that are deemed "part of" the ERISA plan are severable from the remainder of the Employment Agreement.

Pre-trial motions in this lawsuit have already required the Court to flesh out the details of Mr. Marsh's Employment Agreement with the Company and determine which paragraphs are ERISA provisions.   Our ruling on Mr. Marsh's motion for partial judgment on the pleadings makes clear that Paragraphs 7.4, 8.7, and 12.7 are part of his ERISA plan.   *See* Docket No. 58 at 10 (ruling that "the Company's breach of contract allegations arising out of ERISA-governed components of the [E]mployment [A]greement (§ 7.4, § 8.7, § 12.7) must be dismissed").   And, as mentioned *supra*, our ruling on Mr. Marsh's motion to reconsider denial of summary judgment solidifies our conclusion that Paragraph 11.1 is an ERISA provision that relates to attorneys' fees incurred in litigating the parties' competing ERISA claims.   Docket No. 146 at 10 ("[T]o the extent that Mr. Marsh's attorneys' fees and costs relate to his ERISA claim in this lawsuit, the Company committed itself to pay for and, therefore, must pay Mr. Marsh's fees and costs as they are incurred.").   We therefore conclude that, as a matter of law, Paragraphs 7.4, 8.7, 11.1 (with the relevant caveat), and 12.7 (and only those provisions) comprise the ERISA plan portion of Mr. Marsh's Employment Agreement.   No facts adduced at or after trial justify expanding the plan

beyond these provisions.

We pause briefly to address the Company's assertion that Paragraph 7.3 (termination for "Cause") is also a component of the ERISA plan.   The Company acknowledges that this provision does not describe an ERISA-governed benefit, but it argues that Paragraph 7.3's effect on the administration of *other* ERISA-governed benefits brings it within the plan's purview. Specifically, the Company suggests, Paragraph 7.3 is an ERISA provision because termination for cause bars receipt of the ERISA benefits enumerated in Paragraph 7.4.   This position deviates sharply from the one the Company has maintained since 2009, *i.e.*, that "the Salary Continuation Benefit is the only post-employment component of [the] Employment Agreement that constitutes an ERISA employee benefit plan and, therefore, the only one that is governed by ERISA." Docket No. 25 at 14.   The Company now casts Paragraph 7.3 as an "eligibility rule" that provides a "standard" for the Court, arguing that:

> [l]ike [Paragraphs 7.4 and 8.7], [P]aragraph 7.3 comprises part of the ERISA plan in the Employment Agreement because it is essential to the plan's administration. . . . Determining whether Mr. Marsh is entitled to the post-termination benefits described in [P]aragraphs 7.4 and 8.7 requires considering whether Mr. Marsh should be terminated for cause.   Paragraph 7.3 provides the standard for making that determination, and is governed by ERISA as a result.

Pl.'s Resp. at 15.   Citing *Fort Halifax Packing Co.*, the Company insists that Paragraph 7.3 is vital for ongoing administration of the ERISA plan.   We disagree with this assertion for two reasons, the first of which is that the Company's reliance on *Fort Halifax* is misplaced.   The Supreme Court acknowledged in *Fort Halifax* that employers' obligations to ERISA plan participants often include "determining the eligibility of claimants," *Fort Halifax Packing Co.*, 482 U.S. at 9 (language emphasized by the Company), but this excerpt was hardly the crux of the holding. More precisely, *Fort Halifax* addressed the purposes of ERISA preemption:   preventing

"patchwork scheme[s] of regulation . . . in benefit program operation" and "provid[ing] a set of standard procedures" for complex benefit programs.   *Id.* at 9, 11; *see Collins*, 147 F.3d at 595 (noting that ERISA was not implicated in *Fort Halifax* because the plan did not require large-scale financial coordination).   That case, though instructive for many ERISA inquiries, has no bearing on whether a "for-cause" termination provision is part of an ERISA plan within an employment contract tailored to one executive (a "top hat" plan[13]).

We also reject the Company's argument regarding Paragraph 7.3 for the simple reason that it stretches the language of the Employment Agreement too far.   Paragraph 7.3 provides, in relevant part, "At any time during the Term, the Company may terminate this Agreement for 'Cause' as defined in [Paragraph] 8.1 . . . . At any time during the Term, [Mr. Marsh] may terminate this Agreement without 'Good Reason' as defined in [Paragraph] 8.3."   Emp't Agrmt. at 6.   It is unclear to the Court how this provision constitutes any sort of "standard" or "eligibility rule."   If any portions of the Employment Agreement could be characterized in this manner, they would be within Section 8 (which clarifies terms introduced elsewhere in the contract).   By contrast, Paragraph 7.3 merely sets forth the compensation due to the Executive if he is terminated for "Cause" or "Good Reason" and refers the reader of the contract to Section 8 for precise definitions of the operative terms.   This paragraph in no way indicates how the Company

---

[13]A "top hat" plan is "a defined benefits pension plan, but . . . an unfunded one—that is, the benefits are paid directly by the employer rather than by a trust established and funded by the employer, and there are no special tax advantages."   *Denison v. MONY Life Ret. Income Sec. Plan for Emps.*, 710 F.3d 741, 742 (7th Cir. 2013).   These plans are traditionally included in contracts of highly compensated employees like company executives.   *Id.*   Our colleague, Magistrate Judge Baker, has previously ruled that these plans "should be treated as unilateral contracts and reviewed in accordance with ordinary contract principles."   *Marsh v. Marsh Supermarkets, Inc.*, No. 1:06-cv-1395-JDT-TAB, 2007 WL 1021410, at *2 (S.D. Ind. Mar. 29, 2007) (citing *Craig v. Pillsbury Non-Qualified Pension Plan*, 458 F.3d 748, 752 (8th Cir.2006)).

determines "Cause," assesses the Executive's "Good Reason" for leaving the Company, or absolves the Company from complying with other portions of the Employment Agreement, such as Paragraph 12.7 ("Payment Obligation Absolute").   Accordingly, we hold that Paragraph 7.3 is not part of Mr. Marsh's ERISA plan.

Our conclusion that only Paragraphs 7.4, 8.7, 11.1 (in limited fashion), and 12.7 encompass the ERISA plan carries two obvious corollaries.   First, as discussed *supra*, it means that these four provisions are segregable from the remainder of the Employment Agreement. Second, because Paragraphs 3, 5.7(c), and 6 are *not* part of the ERISA plan, the jury's verdict on the Company's breach of contract claim does not automatically spill over to the remaining ERISA proposals or "compel the conclusions" the Company insists it does.   The only results the jury's verdict "compels," at least regarding the Company's breach of contract claim, pertain to the basic premises outlined previously in this entry.   Mr. Marsh *did* breach his Employment Agreement, but only as specified by the jury in its special verdict form.   His breach, though demonstrably significant, does not give this court *carte blanche* to fashion whatever relief the Company deems proper in hindsight.   Only a material breach—"one that goes to the heart of the contract"—affects the parties' obligations to one another.   *Steve Silveus Ins., Inc. v. Goshert*, 873 N.E.2d 165, 175 (Ind. Ct. App. 2007).   As the Company has repeatedly insisted, this tenet of contract law renders Mr. Marsh's breach of Paragraphs 3, 5.7(c), and 6 "material."   This conclusion is well-supported by the ample record evidence and, importantly, is reasonable in light of all the circumstances in this lawsuit.   *See Ream v. Yankee Park Homeowner's Ass'n*, 915 N.E.2d 536, 543 (Ind. Ct. App. 2009) (discussing materiality factors such as the extent to which an injured party is deprived of an expected benefit, the likelihood of the breaching party to cure the injury, and the extent to which

the breaching party's conduct comported with standards of good faith and fair dealing);

RESTATEMENT (SECOND) OF CONTRACTS § 241 (1981).   Nevertheless, characterizing Mr. Marsh's

breach as a reason to nullify the Company's obligations under Paragraph 12.7—a clearly

segregable ERISA provision—is a step too far.   Our ERISA analysis need not involve any

provisions of the Employment Agreement that are not expressly within the contours of the plan,

and we therefore confine our inquiry, as we are required to do, to "the face of written plan

documents."   *US Airways, Inc. v. McCutchen*, 133 S. Ct. 1537, 1548 (2013) (citation omitted).

As previously stated, the ERISA plan took effect in August 1999 as part of Mr. Marsh's

new Employment Agreement.   James Aschleman, the then-partner with the firm of Faegre Baker

Daniels, prepared the plan on behalf of the Company; thereafter, the Company and Mr. Marsh

indicated their respective assent to the plan's terms by signing the Employment Agreement.

Def.'s Post-Trial Br. at 3; *see* Docket No. 219 ¶ 9 (parties' joint stipulation of facts).   According

to former Company Board member Stephen Huse,[14] the Board understood the terms of the ERISA

plan[15] and had no questions regarding the meanings of its provisions.   Trial Tr. at 957.   The

logical outgrowth of Mr. Huse's testimony is that, at the time of executing the Employment

Agreement, the Company and Mr. Marsh each had a clear understanding of Paragraphs 11.1 and

12.7—the portions of the contract that they have subsequently contested *ad infinitum* before this

court.   We, too, accept the fact of the parties' comprehension of the terms in the plan when it was

executed and now, at long last, resolve their continued disagreement by adhering firmly to

---

[14]Mr. Huse was elected to the Board in 1983 and performed his duties (specifically, those assigned to the compensation committee) until the Company was acquired by Sun Capital.   Trial Tr. at 900.

[15]In fact, the general consensus was that the Board had approved "generous" terms for Mr. Marsh.   Def.'s Post-Trial Br. at 3-4.

Supreme Court precedent instructing that claims such as the Company's "stand[] or fall[] by 'the

terms of the plan.'"   *Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan*, 555 U.S. 285, 301

(2009) (quoting 29 U.S.C. § 1132(a)(1)(B)).   Pursuant to the Supreme Court's holding in

*Kennedy*, we acknowledge and adhere to this principle, applying:

> a straightforward rule of hewing to the directives of the plan documents that lets employers "establish a uniform administrative scheme, [with] a set of standard procedures to guide processing of claims and disbursement of benefits." . . . *[B]y giving a plan participant a clear set of instructions for making his own instructions clear*, ERISA forecloses any justification for enquiries into nice expressions of intent, in favor of the virtues of adhering to an uncomplicated rule:   "simple administration, avoid[ing] double liability, and ensur[ing] that beneficiaries get what's coming quickly, without the folderol essential under less-certain rules."

*Id.* at 300-01 (emphases added) (citing *Egelhoff v. Egelhoff*, 532 U.S. 141, 148 (2001); *Fox Valley*

*& Vicinity Constr. Workers Pension Fund v. Brown*, 897 F.2d 275, 283 (7th Cir. 1990)

(Easterbrook, J., dissenting)).

Although courts have been granted the authority to develop a federal common law under

ERISA, *see Mertens v. Hewitt Assocs.*, 508 U.S. 248, 259 (1993), their power in this regard is

limited.   A district court is not entitled to "obscure a plan administrator's duty to act in accordance

with the [plan] documents and instruments."   *Kennedy*, 585 U.S. at 303 (citation omitted).

Within the Seventh Circuit, courts are especially reluctant to create federal ERISA common law

grounded in the language of unjust enrichment when doing so would supersede a provision in a

properly executed ERISA plan.   *E.g.*, *Cummings by Techmeier v. Briggs & Stratton Ret. Plan*,

797 F.2d 383, 390 (7th Cir. 1986) (noting that "[t]he existence of such a contract . . . requires a

particularly strong indication that the unjust enrichment doctrine will vindicate an important

statutory policy").   This type of relief is generally appropriate when the court concludes that only

federal common law can fill an existing "gap."   *See Beach v. Commonwealth Edison Co.*, 382

17

F.3d 656, 659 (7th Cir. 2004); *Metro. Life Ins. Co. v. Johnson*, 297 F.3d 558, 567 (7th Cir. 2002).

According to the Company, Paragraph 12.7 creates this requisite "gap" because it does not address the effect of Mr. Marsh's misconduct on his ability to receive post-termination benefits. Further, the Company alleges, because Mr. Marsh unlawfully obtained his post-termination benefits by "snookering" the Board, "[f]ederal common law confirms that retroactive administration [of the Employment Agreement] is appropriate relief in these circumstances." Pl.'s Resp. at 7.   We echo the Company's view that Mr. Marsh's treatment of Company funds constituted misconduct, but we are not persuaded by its assertions concerning the purported "gap" in ERISA law.   Ultimately, there is no need to create a way for the Company to exercise its self-styled "rights"[16] under the plan.   To the extent the Company had the option to vindicate such rights, that ship sailed well over a decade ago.

Make no mistake:   Mr. Marsh's behavior as President and CEO of the Company was, by our assessment, cavalier, irresponsible, greedy, and deceitful.   We have no doubt that the abundant evidence of his misconduct offends the sensibilities of those who have a familiarity with them.   Mr. Marsh's proven disregard for his duty of good faith to the Company was by every measure troublesome and disappointing.   *E.g.*, *Perfect Flowers, Inc. v. Teleflora, LLC*, No. 1:10-cv-1031-SEB-TAB, 2012 WL 2994636, at *3 (S.D. Ind. July 20, 2012) (reminding parties that good faith, while not a universal contractual requirement, is *de rigueur* in similar

---

[16]To support its argument on this point, the Company again directs the Court's attention to *Bowerman v. Wal-Mart Stores, Inc.*, 226 F.3d 574 (7th Cir. 2000).   The Company finds *Bowerman* instructive because it involved an employee who would have exercised her rights under an ERISA plan but for misleading information provided by the plan administrator.   We do not share the Company's view of *Bowerman*; rather, we hold that the Company's "rights" under the plan are more appropriately viewed as "duties."   Whatever rights the Company had under the plan are secondary to Mr. Marsh's rights—which, as discussed *infra*, have already vested.

relationships); *Am. Commercial Lines, LLC v. Ne. Mar. Inst., Inc.*, 588 F. Supp. 2d 935, 948 n.6 (S.D. Ind. 2008) (noting company agents' special duty "not to . . . actively exploit their positions within the [company] for their own personal benefits").   Counsel's consistently decorous conduct before the Court in litigating this dispute cannot cure the likely irreparable damage to both parties' images and reputations.   The sense that one who has misled others should not benefit when all is said and done hovers over this litigation.   Here, however, both parties must answer for their own regrettable behavior.   Mr. Marsh's missteps have become public knowledge, but the Board members charged with supervising him undoubtedly fell asleep at the wheel (pursuant to the jury's finding on the Company's fraud claim).   The unavoidable post-trial hurdle for the Company is that *the Company* wrote the plan it now asks the Court to retroactively administer in a way that alters its terms to its advantage.   This we cannot do.

A district court's construction of ERISA plan language is guided by basic principles of contract interpretation.   *Frye v. Thompson Steel Co.*, 657 F.3d 488, 493 (7th Cir. 2011).   When the plan is fraught with ambiguities, the rule of *contra proferentem—i.e.*, that vague provisions are construed against the drafter—does not necessarily apply.[17]   *Becker v. Chrysler LLC Health Care Benefits Plan*, 691 F.3d 879, 890 (7th Cir. 2012).   In any event, if the language contained therein is "[c]lear, plain, and unambiguous," courts in Indiana will apply the contractual provisions as written.   *Roche Diagnostics Operations, Inc. v. Marsh Supermarkets, LLC*, 987 N.E.2d 72, 79 (Ind. Ct. App. 2013).   Unambiguous terms are thought to elucidate the parties' intent at contract formation, which is paramount in any subsequent analysis.   *Id.*   As we parse the language of Mr. Marsh's ERISA plan, we are mindful not only of these tenets, but also of the Seventh Circuit's

---

[17]This exception is limited to the ERISA context.   *Becker*, 691 F.3d at 890.

position that "[i]nterpretation and modification [of an agreement] are different; the power to do the first does not imply the power to do the second."   *Cozzie v. Metro. Life Ins. Co.*, 140 F.3d 1104, 1108 (7th Cir. 1998).   The mere existence of the parties' disagreement over the operative terms will not necessarily create an ambiguity.   *Roche*, 987 N.E.2d at 79.   In other words, if an ERISA plan's terms are unmistakably clear, all terms shall be construed against the drafter—in this case, the Company.

For what we hope and expect to be our final time at bat, we grapple once more with Paragraph 12.7 ("Payment Obligation Absolute").   Recall that this section of the ERISA plan contained within Mr. Marsh's Employment Agreement was drafted by the Company's counsel, communicated to the Company and Mr. Marsh, and approved by both parties as evidenced by their signatures affixed in 1999.   It provides, in relevant part, as follows:

> *The Company's obligation* to make the payments and the arrangements and benefits provided for or referred to herein shall be *absolute* and *unconditional*, and *shall not be affected by any circumstances*, including, without limitation, *any offset, counterclaim, recoupment, defense, or other right which the Company may have against [Mr. Marsh]* or anyone else.   All amounts payable by the Company hereunder shall be paid without notice or demand.   Each and every payment made hereunder by the Company shall be *final*, and *the Company shall not seek to recover all or any part of such payment from [Mr. Marsh]* or from whosoever may be entitled thereto, *for any reasons whatsoever.*

Emp't Agrmt. at 13 (emphases added).   We would be hard-pressed to describe the foregoing language as ambiguous, incomplete, or susceptible to multiple interpretations.   In no uncertain terms (to the contrary, in many definite words and phrases), Paragraph 12.7 crystallizes the parties' intent to create contractual rights and duties between them.   This provision firmly establishes Mr. Marsh's unqualified right to receive his employee benefits and the Company's corresponding duty, when such benefits came due, to pay them without dispute.   Peppered with strong modifiers, the paragraph indicates deliberate choices presumably made to eliminate any foreseeable "gray

area" regarding the parties' long-term relationship.   The result of such contract drafting is perhaps, in this case, at least, a harsh result.   Nevertheless, it is a result that—however unpalatable—must be enforced.

"The central problem to which ERISA is addressed is the loss of benefits previously promised."   *Huppeler v. Oscar Mayer Foods Corp.*, 32 F.3d 245, 246 (7th Cir. 1994) (citing JOHN H. LANGBEIN & BRUCE A. WOLK, PENSION AND EMPLOYMENT BENEFIT LAW 82 (1990)).   Indeed, the Supreme Court noted in the formative years of ERISA jurisprudence that a primary purpose of the statute was to ensure that "if a worker has been promised a defined pension benefit upon retirement[,] and if he has fulfilled whatever conditions are required to obtain a vested benefit[,] he actually will receive it."   *Nachman Corp. v. Pension Benefit Guar. Corp.*, 446 U.S. 359, 375 (1980).   Thus, ERISA plans that confer benefits upon an employee's retirement or termination must comply with strict vesting requirements.   29 U.S.C. § 1051.   In the context of pension benefits (such as Mr. Marsh's Salary Continuation Benefit), both parties involved in the plan are free to agree on a pension of whatever magnitude they deem appropriate.   ERISA has no bearing on the amount of these benefits, but it mandates that benefits cannot be forfeited once they have vested.[18]   *Huppeler*, 32 F.3d at 245; *see also* H.R. REP. NO. 93-807, at 4726 (1974) ("A vested benefit is not to be forfeited because the employee later went to work for a competitor, or in some other way was considered 'disloyal' to the employer.").   To that end, the statute expressly provides:   "A right to an accrued benefit derived from employer contributions shall not be treated

_____

[18]In general, the term "vested" means "[having the character or given the rights of absolute ownership; not contingent; not subject to be defeated by a condition precedent."   A "vested" right is one that is "more than a mere expectation based on an anticipation of the continuance of an existing law; it must have become a title, legal or equitable, to the present or future enforcement of a demand, or a legal exemption from the demand of another."   BLACK'S LAW DICTIONARY 1401 (5th ed. 1979).

as forfeitable solely because plan amendments may be given retroactive application as provided in section 1082(d)(2)."[19]   29 U.S.C. § 1053(a)(3)(C).

Health and life insurance benefits ("welfare benefits") are treated slightly differently under ERISA.   Unlike pension benefits, welfare benefits are not *required* to vest unless the plan contract so provides.   *See* 29 U.S.C. § 1051(1); *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995); *Bland v. Fiatallis N. Am., Inc.*, 401 F.3d 779, 783 (7th Cir. 2005).   Welfare benefits may, accordingly, vest when employers negotiate privately with their employees.   *See Vallone v. CNA Fin. Corp.*, 375 F.3d 623, 632 (7th Cir. 2004) (holding that "if ERISA welfare benefits vest at all, they do so under the terms of a particular contract" (citation omitted)).   Through the written instrument required by 29 U.S.C. § 1102(a)(1), "the parties are free to subject such welfare benefits to vesting requirements not provided by ERISA, or they may reserve the power to terminate such plans . . . by private design, as set out in plan documents."   *Ryan v. Chromalloy Am. Corp.*, 877 F.2d 598, 603 (7th Cir. 1989) (citing *Hansen v. White Farm Equip. Co.*, 788 F.2d 1186, 1193 (6th Cir. 1986)); *see also Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 605 (7th Cir. 1993); *Senn v. United Dominion Indus., Inc.*, 951 F.2d 806, 814 (7th Cir. 1992).   Of particular importance in these circumstances are the terms of the ERISA plan; "because vested benefits are forever unchangeable, there is a presumption against vesting if the plan language is silent." *Temme v. Bemis Co.*, 622 F.3d 730, 735 (7th Cir. 2010).   But this presumption applies only when the plan's terms are ambiguous—*i.e.*, "if all the court has to go on is silence"—and drops out when objective evidence manifests the parties' wishes.   *Rossetto v. Pabst Brewing Co.*, 217 F.3d 539, 544 (7th Cir. 2000).   The Seventh Circuit "ha[s] also rejected the position that [plan] documents

---

[19]Section 1082(d)(2) of ERISA deals with retroactive plan amendments that are inapposite to the set of facts underlying the instant lawsuit.

22

must use the word 'vest' . . . or . . . must 'state unequivocally' that the employer is creating rights that will not expire." *Bland*, 401 F.3d at 787 (citing *Bidlack*, 993 F.2d at 607). Thus, where, as here, the ERISA plan makes these benefits contractually nonforfeitable, the Court is free to conclude that the benefits in question have vested.[20]

Because we *do* hold that Mr. Marsh's ERISA-governed benefits are vested and nonforfeitable, we momentarily turn our attention to the Supreme Court's holding in *Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 511 (1981), which we find especially useful as our analysis proceeds. In *Alessi*, while continuing its efforts to flesh out ERISA's "comprehensive and reticulated" provisions, the Court touched on the scope of vested benefits as follows:

> [W]hat defines the content of the benefit that, once vested, cannot be forfeited? ERISA leaves this question largely to the private parties creating the plan. That the private parties, not the Government, control the level of benefits is clear from the statutory language defining nonforfeitable rights as well as from other portions of ERISA. ERISA defines a "nonforfeitable" pension benefit or right as "a claim obtained by a participant or his beneficiary to that part of an immediate or deferred benefit under a pension plan which arises from the participant's service, which is unconditional, and which is legally enforceable against the plan."

*Alessi*, 451 U.S. at 511-12 (quoting 29 U.S.C. § 1002(19)). This principle from *Alessi* still guides courts confronting the challenge of resolving ERISA problems. For example, the Seventh Circuit followed the *Alessi* Court's guidance recently in *Williams v. Rohm & Haas Pension Plan*, 497 F.3d 710 (7th Cir. 2007), when it attempted to define various benefits under retirees' ERISA plan:

> So, what is an "accrued benefit" under ERISA? [Here, t]he Plan urges us to interpret "accrued benefit" to mean *whatever the particular plan document says it means*. Indeed, it finds support for this interpretation in ERISA § 2(23)(A) . . . . ERISA itself directs us to look at the individual plan's terms in order to discern the accrued benefit . . . [and the employee] acknowledges that we must look to the individual plan document to determine what the "accrued benefit" is in *any* given case.

---

[20]"That *nonforfeitable* in the context of ERISA is synonymous with *vested* is borne out in other statutes." *United States v. Infelise*, 159 F.3d 300, 304 (7th Cir. 1998).

*Williams*, 497 F.3d at 712-13 (citing 29 U.S.C. § 1002(23)(A); *Alessi*, 451 U.S. at 511; *Bd. of Trs. of Sheet Metal Workers' Nat'l Pension Fund v. Comm'r*, 318 F.3d 599, 602-03 (4th Cir. 2003)) (emphases added).   Given *Alessi*'s continued vitality as the law of the land on this issue, we conclude that Paragraph 12.7 means exactly what it says:   *all* amounts payable to Mr. Marsh "hereunder," which is to say "pursuant to the ERISA plan," comprise Mr. Marsh's "accrued benefit[s]."

At this late stage of this lawsuit, we agree with Mr. Marsh's pronouncement that "[t]he Company is in a tight spot."   Def.'s Resp. at 9.   Indeed, the Company's desire to wriggle out of what it views as an undesirable result is obvious in light of its multifaceted attack on contract language drafted by its own counsel.   The common thread among these arguments is an appeal to the Court's sense of fairness and equity.   *E.g.*, Pl.'s Post-Trial Br. at 22 (arguing that Mr. Marsh's benefits "are the sort of mistaken payments that equity demands be refunded"); Pl.'s Resp. at 13 (asserting that "equity does not permit a defrauder to receive or keep" benefits); *id.* at 17 (opining that "Mr. Marsh's misconduct justifies the Court's allowing [equitable] relief.").   To the Company, there is no true dilemma before the Court—Mr. Marsh behaved in a manner unbecoming of a CEO; *ergo*, his benefits need no longer be deemed "amounts payable by the Company" under his Employment Agreement.[21]   The crux of the Company's position is that,

_____

[21]We note the Company's reliance on the following excerpt from our order denying summary judgment:   "These damages were the result of non-ERISA compensation and benefits that Mr. Marsh erroneously or wrongfully caused the Company to pay him and arguably far exceeded any entitlement to him under the Agreement."   Docket No. 136 at 14-15.   Now, fully armed with all pertinent undisputed facts, we instruct the Company that the phrase "these damages" refers only to damages incurred in Mr. Marsh's breach of the Employment Agreement and fraud.   "These damages" must not be construed to mean his base salary and bonus payments,

"[s]imply put, the Company seeks to administer the plan exactly as written—the way it would have administered the plan but for Mr. Marsh's fraud." *Id.* at 4. Unfortunately (at least from the Company's perspective), administering the plan "exactly as written" *and* administering it the way the Company purportedly "would have administered the plan" in alternate circumstances are mutually exclusive courses of action. The Seventh Circuit has unmistakably adopted the same view in similar situations, holding that a district court's task is "to apply the [p]lan's actual language rather than the provision that [the employee] wishes the [p]lan had contained. A court can no more rewrite a severance-benefits plan to be more favorable to employees than it could direct [a company] to give its executives eight rather than four weeks of vacation." *Williams v. Interpub. Severance Pay Plan*, 523 F.3d 819, 822 (7th Cir. 2008).

Moreover, we cannot accommodate the Company's recurrent entreaties to "enforce" Paragraph 12.7 by proposing some nebulous "equity at large." ERISA § 502(a)(3) "does not . . . authorize 'appropriate equitable relief' *at large*, but only 'appropriate equitable relief' for the purpose of 'redress[ing any] violations or ... enforc[ing] any provisions' of ERISA or an ERISA plan." *Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 246 (2000) (quoting *Peacock v. Thomas*, 516 U.S. 349, 353 (1996)). The equitable relief contemplated by this portion of the statute is designed to "redress[ ] the '*act or practice*'" which violates ERISA. *Id.* (citing 29 U.S.C. § 1132(a)(3)). Here, the "act or practice" is the Company's refusal to pay Mr. Marsh's ERISA-governed benefits—even though, as the Company proved by a preponderance of the evidence, Mr. Marsh breached his contract and committed actual and constructive fraud against his former employer. It is not in any way unfair to insist that the

---

his Salary Continuation Benefit, his lifetime medical benefits, his various forms of insurance coverage, the premiums due on his life insurance policy, or his grossed-up bonus.

Company now live with the results of its own contract drafting and honor its payment obligations, despite the unsavoriness of the underlying circumstances.   Along these lines, although Mr. Marsh's invocation of the term "hell or high water" is not precisely on point from a purely legal standpoint,[22] his word choice is appropriate.   Undisputed evidence presented at trial revealed that the Company's Board was well aware of Mr. Marsh's alleged misconduct at the time it was occurring and prior to his termination, yet opted to terminate his employment "without cause."   At that point, the manner of Mr. Marsh's termination became irreversible.   By its own terms, the Employment Agreement required several conditions precedent before terminating Mr. Marsh for cause,[23] none of which were found or even considered germane by the Company with reference to Mr. Marsh's termination; further, as we have previously ruled, Mr. Marsh in no way induced the Company to elect the "without cause" option.   Like it or not, the Company must now live with the

---

[22]The Court admits to having harbored curiosity about this term since the inception of its use in this lawsuit.   Our research on this subject indicates that courts traditionally encounter "hell or high water" clauses in various finance leases or acquisition contracts.   As in the matter before us, these clauses require one party to make payments regardless of *any* circumstances, even when that party suffers a total loss.   Seventh Circuit case law is sparse in this regard, but we find persuasive decisions from courts in the Second, Fourth, Eighth, and Tenth Circuits deeming such provisions logical and supported by cogent public policy concerns.   *See Wells Fargo Bank, N.A. v. BrooksAm. Mortg. Corp.*, 419 F.3d 107, 110 (2d Cir. 2005) (discussing parties' sophistication); *Colo. Interstate Corp. v. CIT Grp./Equip. Fin., Inc.*, 993 F.2d 743, 748 (10th Cir. 1993) (casting such clauses' enforceability as "essential" to obtaining the parties' desired outcome); *Am. Computer Trust Leasing v. Jack Farrell Implement Co.*, 763 F. Supp. 1473, 1484 (D. Minn. 1991), *aff'd*, 967 F.2d 1208 (8th Cir. 1992) (noting desire to honor parties' unconditional promises); *Phila. Sav. Fund Soc. v. Deseret Mgmt. Corp.*, 632 F. Supp. 129, 136 (E.D. Pa. 1985) (opining that failure to give such clauses full effect "would effectively reconstruct the contract contrary to the intent of the parties, which reconstruction would be impermissible"); *Allen & Co., LLC v. Sanford USD Med. Ctr.*, No. 08-CV-4596, 2011 WL 941195, at *3 (N.D. Ill. Mar. 15, 2011) (noting that enforcement of these clauses reflects the general principle of freedom of contract).

[23]Paragraph 8.1 required the Company to follow strict procedures prior to a for-cause termination.   Pursuant to this paragraph, Mr. Marsh would "not be deemed to have been terminated for Cause" unless and until the Company complied with these guidelines.   Emp't Agrmt. at 8.

consequences of its prior decisions.

Whether general equitable principles can limit an unambiguous ERISA plan has been a contentious question for some time.   Over the past decade, a circuit split developed on the issue; the Third and Ninth Circuits opined that equitable doctrines could trump an ERISA plan, whereas the Fifth, Seventh, Eighth, Eleventh, and D.C. Circuits espoused the opposite view.   *CGI Techs. & Solutions Inc. v. Rose*, 683 F.3d 1113, 1124 (9th Cir. 2012), *rev'd*, 133 S. Ct. 1995 (2013) ; *US Airways, Inc. v. McCutchen*, 663 F.3d 671, 673 (3d Cir. 2011), *rev'd*, 133 S. Ct. 1537 (2013); *Zurich Am. Ins. Co. v. O'Hara*, 604 F.3d 1232, 1237 (11th Cir. 2010); *Admin. Comm. of Wal-Mart Stores, Inc. v. Shank*, 500 F.3d 834, 838 (8th Cir. 2007); *Moore v. CapitalCare, Inc.*, 461 F.3d 1, 9-10 (D.C. Cir. 2006); *Bombardier Aerospace Emp. Welfare Benefits Plan v. Ferrer, Poirot, & Wansbrough*, 354 F.3d 348, 362 (5th Cir. 2003); *Admin. Comm. of Wal-Mart Stores, Inc. v. Varco*, 338 F.3d 680, 692 (7th Cir. 2003).   The Supreme Court recently granted *certiorari* in *US Airways, Inc. v. McCutchen Airways*, 133 S.Ct. 1537 (2013), to settle the matter, ruling that equitable rules cannot trump specific ERISA provisions.   As in the instant lawsuit, the parties in *US Airways* disputed the enforceability of a reimbursement provision contained in an ERISA plan.   *US Airways*, 133 S. Ct. at 1543.   Specifically, US Airways sought to vacate the Third Circuit's pronouncement that the principle of unjust enrichment could eviscerate the reimbursement clause. While acknowledging that such principles "still might aid in properly construing" an ERISA plan, the Supreme Court reversed the Third Circuit's decision with the admonishment that "[t]he plan, in short, is at the center of ERISA."   *Id.* at 1548.   The Court analogized the situation before it to an "equitable lien by agreement,"[24] holding that:

---

[24]The concept of an "equitable lien by agreement" is deeply rooted in Supreme Court

US Airways . . . is seeking to enforce the modern-day equivalent of an "equitable lien by agreement."   And that kind of lien—as its name announces—both arises from and serves to *carry out a contract's provisions*.   So enforcing the lien means *holding the parties to their mutual promises*.   Conversely, it means declining to apply rules—even if they would be "equitable" in a contract's absence—at odds with the parties' expressed commitments.

*Id.* at 1546 (citations omitted) (emphases added).   At bottom, the Court concluded, the existence of an express contract in the ERISA context renders unjust enrichment and similar equitable claims "beside the point."   *Id.*   This court, having thoroughly reviewed the holding in *US Airways*, finds no grounds on which to depart from it—and thus will not.

Once more we recognize that the exacting limitations the law places on retroactive amendments to ERISA plans takes the shine off the Company's trial victory.   We are not unsympathetic to the Company's plight; in truth, we understand the source of its outrage over Mr. Marsh's misconduct.   Nonetheless, the aspects of ERISA law discussed above serve the overarching purpose of "protect[ing] the financial integrity of pension and welfare plans by confining benefits to the terms of the plans as written, thus ruling out . . . modifications" in circumstances such as these.   *Pohl v. Nat'l Benefits Consultants, Inc.*, 956 F.2d 126, 128 (7th Cir. 1992).   ERISA plan interpretations rendered by courts must therefore "serve the greater good of plan participants throughout the economy."   *Plummer v. Consol. City of Indianapolis*, No. 1:03-cv-00567-DFH-WTL, 2004 WL 2278740, at *11-12 (S.D. Ind. Aug. 17, 2004).   Strict guidelines, however frustrating, prevent ERISA plan administrators from the nightmare of examining a wide variety of documents purporting to affect the implementation of the plan. Moreover, in the Supreme Court's estimation, a lax ERISA scheme would force plan administrators to engage in endless litigation over the enforceability of plans.   *Kennedy*, 555 U.S.

---

jurisprudence.   *See, e.g.*, *Barnes v. Alexander*, 232 U.S. 117, 121-22 (1914).

at 301.   Writing for a unanimous Court in *Kennedy*, Justice Souter remarked, "[T]he cost of less certain rules would be too plain. . . . [I]t would destroy a plan administrator's ability to look at the plan documents and records confirming them to get clear distribution instructions, without going into court."   *Id.*   Bearing in mind the onerous caseloads facing district court judges, we are in complete agreement with Justice Souter's wise pronouncement.   We conclude, therefore, that strict construction of this ERISA plan is the most balanced, reasonable way to serve the public good and ensure the continued viability of the ERISA statute at large.

"[I]f the agreement governs, the agreement governs."   *US Airways*, 133 S. Ct. at 1547. Because the agreement *does* govern in this case, and for the foregoing reasons, we hold that Mr. Marsh is entitled to relief under ERISA § 502(a)(3).   Resolving Count I of the Amended Counterclaim in Mr. Marsh's favor means that the Company must tender all post-termination benefits set forth in Paragraph 7.4 to Mr. Marsh.   Judgment in the amount of $2,171,261.48 shall issue in favor of Mr. Marsh contemporaneously with this entry.   Conversely, we hold that the Company is not entitled to relief under ERISA § 502(a)(3), and we resolve Count III of the Company's Amended Complaint in favor of Mr. Marsh.

Having concluded that Mr. Marsh is entitled to all benefits accompanying a not "for-cause" termination (as set forth in the Employment Agreement), we may dispose of Mr. Marsh's breach of contract counterclaim in short order.   Indiana law, which governs the Employment Agreement, imposes three prima facie elements for a breach of contract claim:   the existence of a contract, a party's breach thereof, and damages.   *Niezer v. Todd Realty, Inc.*, 913 N.E.2d 211, 215 (Ind. Ct. App. 2009).   The Court's ability to determine whether the Company failed to perform its duties under the Employment Agreement was heretofore encumbered by our analysis of the parties'

29

competing ERISA claims.   Now that the dust has settled regarding the Company's ERISA obligations, we conclude that the Company is in breach of the Employment Agreement, resulting in damages to Mr. Marsh which we set in the amount of $2,171,261.48 (as Mr. Marsh has requested, pursuant to 7.4 of the Employment Agreement).   Accordingly, we resolve Count II of Mr. Marsh's Amended Counterclaim in favor of Mr. Marsh.[25]

### B.  Attorneys' Fees and Costs

Given the protracted nature of this lawsuit, the Court will not hazard a numerical guess as to the amount of attorneys' fees and costs incurred by both parties.   Suffice to say, however, that we know considerable resources have been invested to shepherd the case from initial filing to trial. We have addressed the issue of attorneys' fees in pre-trial rulings, but we have limited our analysis to the fees arising out of ERISA litigation.   As we bring final resolution to the parties' post-trial claims, we will now address attorneys' fees and costs regarding all aspects of the lawsuit.

The fee-shifting portion of ERISA, Section 1132(g)(1), permits the district court in its discretion to award either party "a reasonable attorney[s'] fee and costs of [the] action."   29 U.S.C. § 1132(g)(1).   Within the Seventh Circuit, there is a "modest" but rebuttable presumption in favor of conferring fees and costs to the "prevailing party."   *Stark v. PPM Am., Inc.*, 354 F.3d 666, 673 (7th Cir. 2004).   If the losing party's position "was both 'substantially justified' . . . and taken in good faith, or if special circumstances make an award unjust," it is the court's prerogative to deny an award of fees to the prevailing party.   *Senese v. Chi. Area I.B. of T. Pension Fund*, 237 F.3d 819, 826 (7th Cir. 2001).   A losing party's argument for attorneys' fees will be deemed "substantially justified" if it falls somewhere between "non-frivolous" and "meritorious."   *Stark*,

---

[25]The Company remains entitled to collect on its judgment against Mr. Marsh based on the jury's verdict.

354 F.3d at 673.   Additionally, Federal Rule of Procedure 54 instructs that, "[u]nless a federal

statute, these rules, or a court order provides otherwise, costs—other than attorney[s']

fees—should be allowed to the prevailing party."   Fed. R. Civ. P. 54(d)(1).

Based on these principles and our prior determinations concerning ERISA-related fees and

costs, we confirm the substance of our May 18, 2012 order.   In granting Mr. Marsh's motion for

reconsideration, we concluded that Seventh Circuit case law supported an award of attorneys' fees

and costs to Mr. Marsh—"to the extent that [his] attorneys' fees and costs relate to his ERISA

claim in this lawsuit."   Docket No. 146 at 10.   Our ruling is consistent with the outcome of the

trial, our resolution of the ERISA claims (*i.e.*, that Mr. Marsh is the "prevailing party" on those

claims), and binding case precedent.   Contractual provisions like Paragraph 11.1, which was the

focus of our May 18, 2012 ruling, are "designed to force [a] company to pay when an employee is

able to make a good-faith claim[26] that benefits were improperly denied."   *Chojnacki v. Ga.-Pac.*

*Corp.*, 108 F.3d 810, 818 (7th Cir. 1997).   Further, the Seventh Circuit has deemed it

"straightforward" that when provisions like Paragraph 11.1 clearly confer reasonable attorneys'

fees, it is "not a matter of discretion;" the court must enforce this fee arrangement.   *Bowles v.*

*Quantum Chemical Co.*, 266 F.3d 622, 636 (7th Cir. 2001).   The Company's post-trial arguments

regarding ERISA-related fees and costs, although not frivolous, are a far cry from meritorious in

light of our previous rulings.[27]   *See generally Jackman Fin. Corp. v. Humana Ins. Co.*, 641 F.3d

---

[26]On a somewhat related note, the Seventh Circuit has recently "abandoned the idea that a finding of bad faith is vital to an award of fees."   *Raybourne v. Cigna Life Ins. Co. of N.Y.*, 700 F.3d 1076, 1090 n.6 (7th Cir. 2012).

[27]For instance, the Company cites *Gerow v. Rohm & Haas Co.*, 308 F.3d 721 (7th Cir. 2002), to support its position that bargaining in advance over attorneys' fees, regardless of who prevails at trial, is unenforceable.   Specifically, the Company highlights Chief Judge Easterbrook's pronouncement that "[a]n opportunity to litigate on the adversary's dime, without

860 (7th Cir. 2011).   Thus, we stand on our previous ruling, and say again that Paragraph 12.7,

which we interpret in a fashion consistent with the views advanced by Mr. Marsh, moves in

tandem with Paragraph 11.1.   In other words, Paragraph 12.7 safeguards from setoff or

recoupment not only Mr. Marsh's benefits described in Paragraph 7.4, but also those listed in

Paragraph 11.1.

But Mr. Marsh is not entitled to recover attorneys' fees and costs on the remaining claims

in this lawsuit (*i.e.*, the non-ERISA claims).   As we have repeatedly stated, the scope of Paragraph

11.1 is extremely limited.   With regard to the non-ERISA claims in this lawsuit, Paragraph 11.1 is

wholly inapposite.   Our determination regarding the ERISA-related attorneys' fees and costs is

"not a grant of authority to do good, rectify shortcomings of the common law . . . or undermine the

American rule on the award of attorneys' fees to the prevailing party in the absence of [a] statute."

*Tucker v. Williams*, 682 F.3d 654, 662 (7th Cir. 2012) (citation omitted).   Accordingly, we hold

that the Company is entitled to recover all attorneys' fees and costs incurred in litigating the claims

on which it prevailed at trial—that is, the breach of contract, fraud, and false tax filing claims.

### III.   Conclusion

For the reasons detailed in this entry, we hold as follows:   (1) the Company is not entitled

---

any need to prevail in order to collect, creates a moral hazard."   *Gerow*, 308 F.3d at 725.   But this quote hardly describes the tenor of the Seventh Circuit's ruling.   In fact, the court concluded that the terminated employee was "on solid ground" to the extent that he read the attorneys' fees provision as providing fees through final resolution of the case.   The court did caution that such a provision ceased being enforceable at the moment when, "under the circumstances[,] pressing on was unreasonable" or not substantially justified.   *Id.*   Concluding that the employee ought to have given up the fight after losing at the district court level (but noting his right to pursue an appeal), the court determined that his former employer was responsible only for the fees and costs incurred at that point of the lawsuit.   Thus, all fees and costs associated with the appeal were borne by the parties.   We therefore reject the Company's argument as off-point and non-meritorious.

to equitable relief under ERISA § 502(a)(3) (Count III of its Amended Complaint); (2) Mr. Marsh

is entitled to equitable relief under ERISA § 502(a)(3) (Count I of his Amended Counterclaim); (3)

the Company breached Mr. Marsh's Employment Agreement by failing to tender Mr. Marsh's

properly payable post-termination benefits (Count II of Mr. Marsh's Amended Counterclaim); (4)

Mr. Marsh is entitled to recover attorneys' fees and costs as incurred in litigating the ERISA

claims, but only those claims; and (5) the Company is entitled to recover attorneys' fees and costs

incurred in litigating the non-ERISA claims in this lawsuit.   We award a judgment in the amount

of $2,171,261.48 to Mr. Marsh in satisfaction of his ERISA claims.   Finally, the parties are

instructed to determine their respective attorneys' fees and costs and, if an agreement cannot be

reached, submit the issues to the Court for final ruling.

        IT IS SO ORDERED.

Date:     _____07/29/2013

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

33

Copies to:

Andrew M. McNeil
BOSE MCKINNEY & EVANS, LLP
amcneil@boselaw.com

Jonathan Lamont Mayes
BOSE MCKINNEY & EVANS, LLP
jmayes@boselaw.com

Winthrop James Hamilton
BOSE MCKINNEY & EVANS, LLP
jhamilton@boselaw.com

David K. Herzog
FAEGRE BAKER DANIELS LLP - Indianapolis
david.herzog@faegrebd.com

Munjot Sahu
FAEGRE BAKER DANIELS LLP - Indianapolis
munjot.sahu@faegrebd.com

Ryan Michael Hurley
FAEGRE BAKER DANIELS LLP - Indianapolis
ryan.hurley@FaegreBD.com

Linda Joy Cooley
KRIEG DEVAULT, LLP
lcooley@kdlegal.com